ÁNGEL L. ARROYO, recurrente, *v.* EL REGISTRADOR DE LA PROPIEDAD DE MAYAGÜEZ, recurrido.

Número: 1381     Resuelto: 5 de noviembre de 1962

*José Sabater,* abogado del recurrente; el Registrador recurrido compareció por escrito.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

El recurrente Ángel L. Arroyo instó ante el Tribunal Superior, Sala de Mayagüez, un procedimiento sumario para ejecutar una hipoteca constituida mediante la escritura número 87 de 9 de julio de 1957 ante el notario Eudaldo Báez García por los esposos Antero Díaz Segarra y Rosa María Ríos a favor del tenedor de un pagaré al portador por la suma principal de tres mil dólares, sus intereses a razón del nueve por ciento anual y un crédito adicional de trescientos dólares para costas, gastos y honorarios de abogado en caso de ejecución judicial, sobre cuatro fincas rústicas propiedad de éstos sitas en el barrio Ovejas del término municipal de Añasco, con cabidas de 24, 14, 8 y 5 cuerdas. Seguido el trámite de requerimiento de pago prescrito por la ley, sin que los deudores consignaran las cantidades adeudadas que a la fecha de la iniciación del procedimiento ascendían a $3,772.50, el actor solicitó y obtuvo la correspondiente orden de venta en pública subasta, partiendo de la tasación fijada a cada finca en la escritura de constitución de hipoteca "para servir de tipo a la primera subasta" a celebrarse.

A la primera y única subasta celebrada concurrió como solo postor el propio acreedor ejecutante, quien ofreció por las fincas las mismas cantidades en que fueron tasadas por los contratantes, a saber: $1,075 (24 cds.), $875 (14 cds.).

$675 (8 cds.) y 675 (5 cds.). No habiéndose mejorado dichas ofertas, se le adjudicó la buena pro otorgándose por el Alguacil a favor del recurrente la correspondiente escritura de venta judicial. ■

Presentada dicha escritura en el Registro de la Propiedad de Mayagüez, se denegó su inscripción por observarse que el tribunal ordenó la venta en pública subasta de las fincas hipotecadas partiendo de la tasación fijada en la escritura de hipoteca cuyos importes son menores de los créditos preferentes que gravan cada finca[1] y que se adjudicaron en la primera subasta por dichos precios de tasación.[2] "viciando de nulidad el procedimiento sumario de conformidad con los artículos 128 de la Ley Hipotecaria y 172 del Reglamento de la Ley Hipotecaria y con lo resuelto en los casos de *Cintrón v. Banco Territorial Agrícola*, 15 D.P.R. 507 y *Hernández v. Registrador*, 66 D.P.R. 863." Contra la denegatoria se interpuso en tiempo el presente recurso gubernativo. ■

[1] Según aparece de la nota denegatoria, los créditos preferentes a que se refiere el Registrador son los siguientes créditos hipotecarios constituidos todos en fecha anterior al que es objeto de ejecución: 1—a favor del Federal Land Bank of Baltimore, por $4,100 de capital, $922.50 de intereses, $300 para costas en caso de ejecución y otros créditos accesorios; 2—a favor del tenedor de pagaré, por $3,000 de principal y otros créditos; 3—a favor del tenedor de pagaré, por $1,000 de principal, intereses al 9% y $200 de crédito ejecutivo; 4—a favor del tenedor de pagaré, por $1,000 de principal; 5—a favor del tenedor de pagaré, por $545 de capital; y, 6—a favor del tenedor de pagaré, por $1,000. El principal total de los créditos preferentes asciende a $10,645.

Debido a que las cuatro fincas responden solidariamente del crédito a favor del Federal Land Bank—artículo 119 de la Ley Hipotecaria, según enmendado por la Ley Núm. 62 de 21 de julio de 1923 (Leyes, pág. 407), 30 L.P.R.A. sec. 215, cada una de las fincas resulta responder de las siguientes cantidades de los créditos preferentes: 24 cuerdas, $6,800; 14 cuerdas, $5,876.66; 8 cuerdas, $5,221.66; y, 5 cuerdas, $4,646.68.

[2] En la escritura de venta judicial no se transcribió el edicto publicado, por lo cual ignoramos si se relacionaron los créditos preferentes para advertir a los licitadores de su existencia. El párrafo 5º del artículo 128 de la Ley Hipotecaria, 30 L.P.R.A. sec. 224, y el párrafo 1º del artículo 172 del Reglamento, 30 L.P.R.A. sec. 1093, disponen que se publicarán los edictos "con expresión del estado de los títulos de propiedad."

1. Al aprobarse la Ley Hipotecaria para las Provincias de Ultramar que comenzó a regir en Puerto Rico el día 5 de octubre de 1893, una de las modificaciones más importantes introducidas a la anterior ley vigente desde el 1 de mayo de 1880 consistió en la adopción del procedimiento sumarísimo para hacer efectivos los créditos hipotecarios, (³) una de cuyas bases era la previa tasación de la finca hipotecada. Hasta entonces, conforme al artículo 141 de la Ley de 1880, "[a]l vencimiento del plazo para el pago de la deuda, el acreedor podrá pedir que se despache mandamiento de ejecución contra todos los bienes hipotecados. . ." prosiguiéndose a tales efectos según el procedimiento de apremio dispuesto en la Ley de Enjuiciamiento Civil que en sus artículos 1483 y siguientes proveía para el avalúo de los bienes. El Artículo

---

(³) En el mensaje dirigido en 26 de mayo de 1893 a las Cortes por don Antonio Maura y Montaner, entonces Ministro de Ultramar, con el cual se acompañó la mencionada ley de reforma hipotecaria (Ley Hipotecaria para las Provincias de Ultramar, edición oficial, 1893, págs. 9–10), se decía:

"Pero donde la voz de la experiencia se ha dejado oir con mayor fuerza contra la ley, demandando remedio pronto, es en lo referente al procedimiento para hacer efectivos los créditos hipotecarios. Su complicación abrumadora, la inseguridad del éxito y su coste incalculable, retraen el capital o sugieren condiciones usurarias; la venta a retro viene sustituyendo al préstamo, para suprimir todo procedimiento con daño del terrateniente; se estipulan intereses que triplican el capital prestado y tal vez empleando otras fórmulas, se sujeta con responsabilidades penales al deudor, convirtiendo la santidad de las leyes escritas para castigar delitos en vil instrumento de la codicia contra el infortunio. Emplea estas artes la desconfianza, porque el procedimiento legal no satisface las exigencias razonables de la contratación, y a cortar la raíz de estos males, proporcionar a la tierra el capital que necesita, y dar al prestamista seguridades de pronto y fácil cobro, se consagra la reforma de mayor transcendencia que propone el Gobierno, suprimiendo trámites que, sin garantía positiva de los derechos, ahoga los más sagrados. *La previa tasación*, la fijeza en la competencia judicial para las diligencias precisas, la supresión de todo pleito, un solo requerimiento y la subasta inmediata, son las bases de la nueva legislación; suprímese juicios, exenciones, exhortos, mandamientos de embargo de lo que está ya hipotecado, incidentes, subastas simultáneas y tantas otras barreras atravesadas en la senda del crédito territorial con noble ánimo, en las que sólo tropieza realmente la buena fe."

1516 de la citada Ley de Enjuiciamiento Civil disponía que "[s]i la ejecución se hubiere despachado a instancia de un segundo o tercer acreedor hipotecario, el importe de *los créditos hipotecarios preferentes*, de que responda la finca vendida, se consignará en el establecimiento destinado al efecto, y el resto se entregará sin dilación al ejecutante, si notoriamente fuere inferior a su crédito o lo cubriere." [4] ▪

La Ley de 1893 incorporó en su artículo 127 la previa tasación disponiendo que en la escritura de hipoteca se haría constar el precio en que los contratantes tasaban la finca para que sirviera de tipo a la *"única subasta"* en caso de ejecución. Véase, para una exposición histórica más completa, *Autoridad de Tierras* v. *Registrador*, 82 D.P.R. 338, 340–343 (1961). En el artículo 128 siguiente se indicó que "no habiendo postor, podrá el ejecutante pedir que se le adjudiquen los bienes, respondiendo de todas las cargas anteriores [5] si las hubiere," y que "cuando se subaste la finca *a instancia de un segundo o posterior acreedor hipotecario* o de acreedores comunes, se declarará sin efecto tal subasta si no ofrece cantidad suficiente para pagar, con los intereses que consten en el Registro, *todos los créditos ante-*

---

[4] Este mismo sistema de purga de las hipotecas anteriores prevaleció en España hasta la adopción de la Ley Hipotecaria que comenzó a regir en 21 de abril de 1909.

Obsérvese la notable correspondencia entre este artículo 1516 y el párrafo siete del artículo 172 del Reglamento que reglamentaba el trámite para el caso de que no hubiere postor en la primera subasta, y que según resolvimos en *Vechini, Etc.* v. *Registrador*, 84 D.P.R. 217 (1961) no se encuentra vigente.

A su vez este artículo 1516 debe relacionarse con el siguiente 1518 que provee para la cancelación de las inscripciones de las hipotecas a que estuviere afecta la finca vendida mediante la expedición del correspondiente mandamiento en el cual se exprese "haberse consignado el importe del crédito del primer acreedor." Véase, José P. San Ramón Colino, El Juicio Ejecutivo y sus Formularios, Ed. Mayo, (Madrid, 1959), págs. 182–184.

[5] En *Vechini*, supra, citando a Morell, t. 7, pág. 125, indicamos que las palabras "anteriores" y "preferentes" se referían indistintamente a las "cargas" o a los "gravámenes".

*riormente inscritos.*" Y en el párrafo tercero del artículo 172 del Reglamento se proveía que "[c]uando el justiprecio de los bienes, convenido en el título del crédito en cuya virtud se proceda, supere la cuantía de las responsabilidades preferentes aseguradas con los bienes, aquél se expresará en los edictos como tipo para la subasta," pero "[c]uando las responsabilidades preferentes sean más cuantiosas, su importe total será el tipo mínimo de la subasta."

En 9 de marzo de 1905 se aprobó la Ley Relativa a las Sentencias y Manera de Satisfacerlas (Leyes, pág. 185), 32 L.P.R.A. secs. 1140–1147, que tuvo el efecto de derogar el referido artículo 127, y por tanto, se hizo innecesario hacer el justiprecio de la finca hipotecada a los fines de la subasta, la que se verificaba sin sujeción a tipo mínimo. En efecto, el procedimieno ejecutivo sumario sólo quedó vigente desde la presentación del escrito inicial hasta la consumación del **requerimiento de pago.** *Carrión* v. *Registrador*, 43 D.P.R. 109 (1932); *Iglesias* v. *Registrador*, 43 D.P.R. 19 (1932); *Porto Rico Leaf Tobacco Co.* v. *Registrador*, 23 D.P.R. 507, 509 (1916); *Cintrón* v. *Banco Territorial y Agrícola*, 15 D.P.R. 507, 524 (1909); *Bolívar* v. *Registrador*, 13 D.P.R. 375 (1907); *Banco Territorial Agrícola* v. *Erwin*, 10 D.P.R. 412 (1906); *Jiménez* v. *Brenes*, 10 D.P.R. 128 (1906). En el trámite que se seguía —sin sujeción a justiprecio para el remate— y en deferencia al principio de que no podían afectarse los derechos adquiridos por acreedores preferentes— cualquier adjudicación se hacía sujeta a los créditos anteriores.

Debido a los numerosos abusos a que dio lugar la ausencia de justiprecio, con la consiguiente adjudicación o re-

---

Es de observarse que en cuanto a las cargas propiamente dichas, siempre ha regido el sistema de *subsistencia,* disponiendo el párrafo 4 del artículo 172 del Reglamento que "para determinar el importe de las **responsabilidades** preferentes, capitalizará el juez el de los censos y las demás cargas perpetuas que tengan prelación, *las cuales quedarán a cargo del comprador y se rebajarán del precio,* consignándose en los edictos esta circunstancia."

mate por cantidades irrisorias, la Asamblea Legislativa, mediante la Ley Núm. 69 de 2 de mayo de 1931 (Leyes, pág. 433), enmendó el artículo 127 en la forma siguiente: (⁶)

"En la escritura de hipoteca se hará constar el precio en que tasan la finca los contratantes, para que sirva de tipo a la primera subasta que se debe celebrar, en el caso de que, vencido el plazo del préstamo, no conste en el registro de propiedad el pago de dicho préstamo."

En el artículo 2 de la Ley mencionada se hizo constar que las disposiciones de la Ley de 9 de marzo de 1905 en cuanto se opusieran a los preceptos del Artículo 127 quedaban derogadas.

Como se observará esta última redacción del artículo 127 elimina la referencia a la única subasta que figuraba en la Ley de 1893 y la sustituye por primera subasta, y además, mediante la adición de los párrafos segundo y tercero, dispone expresamente para la cuantía mínima que deberá prevalecer si se celebrare una segunda subasta o subastas adicionales. En relación con estas subastas posteriores, estos dos párrafos se enlazan con los párrafos 6 a 9 del artículo 172 del reglamento (⁷) que, repetimos, no se encuentran vigentes.

---

(⁶) Esta legislación se aplica únicamente a las escrituras de hipoteca otorgadas después de entrar en vigor la Ley Núm. 69 de 1931, *supra*, y las subastas en ejecución sumaria de hipotecas otorgadas antes de su vigencia no necesitaban ajustarse al procedimiento señalado en la misma. *Cotto* v. *Corte*, 53 D.P.R. 367 (1938); *Carrión* v. *Registrador*, 43 D.P.R. 109 (1932); *Iglesias* v. *Registrador*, 43 D.P.R. 19 (1932).

(⁷) Dichos párrafos leen así:

"La subasta se verificará en la forma prevenida para el juicio ejecutivo; pero cuando las dos terceras partes del tipo marcado en los edictos no excediere de la cuantía de las responsabilidades preferentes, esta cuantía señalará el mínimo de las posturas admisibles.

No habiendo postor en esta primera subasta, podrá el ejecutante pedir que se le adjudiquen los bienes por el menor tipo que hubiera podido admitirse a un rematante, según el párrafo anterior, respondiendo de todas las cargas anteriores y debiendo consignar el exceso que acaso resulte, cubierto su crédito. Este exceso se entregará a quien coresponda, depositándolo el juez a disposición del mismo en el establecimiento público destinado al efecto, si no quedare entregado dentro de los diez días siguientes a la consignación.

Hasta aquí la reseña histórica de la legislación sobre la tasación de la finca hipotecada. ■

2. Harto difícil resulta el problema de tratar de armonizar las disposiciones de los artículos 127 y 128 de la Ley Hipotecaria y el artículo 172 del Reglamento.[8] Ello obedece a su entronque con otras disposiciones de la Ley de Enjuiciamiento Civil de España, que como sabemos, no rige en Puerto Rico, salvo contadas excepciones. Por otro lado, no aparece claro si el legislador intentó adoptar el sistema de subsistencia de las cargas o gravámenes cuando el inmueble se adjudica al segundo o posteriores acreedores hipotecarios, o si se insiste en el sistema de purga de los créditos preferentes que se consagraba en el juicio ejecutivo de la Ley de Enjuiciamiento Civil—Art. 1516, *supra*. Por creerlo conveniente haremos una breve referencia a ambos sistemas. ■

En el sistema de subsistencia o mantenimiento de las hipotecas preferentes, la ejecución no produce su extinción,

---

Si el ejecutante no pidiere la adjudicación, podrá solicitar que se pongan de nuevo los bienes hipotecados en pública subasta con rebaja del 25 por 100 del tipo fijado en la primera, con tal que esta reducción deje cubiertos los créditos anteriores. Para ello deberá presentar el actor nueva certificación del registro, expresiva de que su hipoteca no ha sido cancelada, si hubiese estado suspenso el procedimiento por más de seis meses. Esta subasta se verificará en la misma forma que la primera, pudiendo admitirse posturas que cubran los dos tercios del precio reducido, siempre que cubran los créditos preferentes al del actor. También podrá éste pedir la adjudicación, en las condiciones expresadas, si la segunda subasta quedare desierta en todo o en parte.

No produciendo remate ni adjudicación la segunda subasta, podrán celebrarse otras a instancia del actor, llenando éste en su caso el requisito que se expresa en los párrafos precedentes, por el precio irreductible equivalente a los créditos preferentes. También podrá pedirse en tal caso la adjudicación por este mismo precio, con obligación de cubrir dichas cargas a su vencimiento, subrogándose respecto de ellas en el lugar del deudor."

[8] Nos referimos a los primeros cinco párrafos de dicho artículo 172, ya que en *Vecchini, Etc.* v. *Registrador*, 84 D.P.R. 217 (1961), expresamente indicamos que los últimos cuatro párrafos del mismo dejaron de tener vigencia, pues la subasta no se verifica en la forma prevenida en la Ley de Enjuiciamiento Civil Española—el juicio ejecutivo—sino por el artículo 127, según enmendado en 1931.

sino que se mantienen vivas; en el de purga, los créditos preferentes se extinguen con la ejecución, destinándose a su satisfacción *el precio del remate*. De ahí que sea imprescindible que, cuando menos, el precio mínimo siempre cubra el importe de estas responsabilidades preferentes. Como indica Roca Sastre *(Derecho Hipotecario*, (ed.1954) tomo IV, pág. 870), "la finca pasa pura y limpia de hipotecas, o sea purgada de ellas, al adjudicatario o adquirente." Al declararse partidario del sistema de subsistencia, don Jaime Guasp, Catedrático de Derecho Procesal de la Universidad de Madrid, se manifiesta en la siguiente forma: [9]

"No es difícil comprender los inconvenientes que semejante sistema [el de purga] traía consigo, sobre todo para un eficaz desarrollo del crédito territorial. En primer término, el titular de una segunda hipoteca o posterior corría el riesgo, en el momento de la ejecución, de que fuera eliminada su garantía por un posible resultado desfavorable de la subasta; en segundo lugar, el acreedor preferente veía desaparecer la inversión de su capital por una operación liquidatoria que llegaba incluso a variar la naturaleza del derecho de que es titular. Ello explica que no sólo en España, sino en otros países también, el principio de la liquidación o extinción de cargas haya cedido el puesto a su contrario: el principio de la subrogación, por virtud del cual dichas cargas preferentes se tramiten al nuevo adquirente del inmueble." ■

El Registrador Eduardo Martínez Mora resume así los principales argumentos en favor de la reforma de 1909; [10] (1) el conocimiento que ya tiene el acreedor ejecutante de la hipoteca anterior; (2) la segunda hipoteca no está cubierta con la finca, sino con el excedente de valor de la primera; (3) los acreedores preferentes no son parte en el procedi-

---

[9] *La Ejecución Procesal en la Ley Hipotecaria*, Ed. Bosch (Barcelona), 1951, págs. 144-145.

[10] *El Sistema de Liquidación de Cargas y la Ley Hipotecaria*, Revista Crítica de Derecho Inmobiliario, tomo 5, págs. 273-278 (1929).

miento;([11]) (4) la indiferenciación que debe existir entre la enajenación judicial y la extrajudicial (se refiere a la provista en el artículo 129 de la ley española). Sobre este mismo tema, véase, Revista Crítica de Derecho Inmobiliario, tomo 18, pág. 822 (1945); tomo 17, pág. 450 (1944); tomo 15, pág. 455 (1942), y tomo 5, pág. 117 (1929); Revista de Derecho Privado, tomo V, pág. 190 (1918).

En España la reforma hipotecaria de 1909 abandonó el sistema de purga de la Ley de Enjuiciamiento Civil y adoptó el de subsistencia de los gravámenes preferentes, e impuso la subrogación de la persona del adjudicatario en el pago del crédito personal garantizado con la hipoteca.([12])    Al efecto el artículo 131 dispone en parte como sigue:

"Octava.    En los anuncios se expresará: que los autos y la certificación del Registro a que se refiere la regla 4a. estarán de manifiesto en la Escribanía; que se entenderá que todo licitador acepta como bastante la titulación, *y que las cargas y gravámenes anteriores y los preferentes—si los hubiere—al crédito del actor continuarán subsistentes, entendiéndose que el rematante los acepta y queda subrogado en la responsabilidad de los mismos, sin destinarse a su extinción el precio del remate.*

"Novena.    Servirá de tipo para la subasta el pactado en la escritura de constitución de hipoteca, y no se admitirá postura alguna que sea inferior a dicho tipo.

"Décima.    Si no hubiese postura admisible en la primera subasta, el acreedor podrá pedir la adjudicación de la finca o fincas en pago de su crédito por el tipo de aquélla, *aceptando*

([11]) No parece justo que los acreedores anteriores sufran las consecuencias de un procedimiento en el cual no son parte, especialmente si se considera que aun en el caso de los acreedores de rango registral inferior al ejecutante su crédito subsiste si no se les notifica de la ejecución en la forma prevenida por la ley. *Vendrell v. Torres Aguiló*, 85 D.P.R. 873 (1962).

([12]) Es digno de ser notado el artículo 227 del Reglamento español de 1959 que dispone que "se considerarán preferentes, a los efectos del art. 131 de la ley, las cargas o gravámenes *simultáneos* o del *mismo cargo* que el crédito del actor." Confróntese con el último párrafo del artículo 125 de la Ley Hipotecaria, 30 L.P.R.A. sec. 221; *Schluter v. Registrador*, 37 D.P.R. 702 (1928); *Ortiz v. Registrador*, 22 D.P.R. 339 (1915); *American Trading Co. v. Monserrat*, 19 D.P.R. 979 (1913).

*la subsistencia de las cargas anteriores y las preferentes, si las hubiere, y subrogándose en la obligación de satisfacerlas.*

"Undécima. Si no conviniese al acreedor la adjudicación, podrá solicitar la celebración de segunda subasta, para lo cual servirá de tipo el 75 por 100 de la primera, sin que se pueda admitir postura inferior a dicho tipo, y si tampoco en ella hubiera postura admisible, podrá pedir la adjudicación por el tipo de la segunda subasta y con la misma condición indicada en la regla anterior.

. . . . . . . . .

"Décimotercera. En el acto de la subasta se hará constar que el rematante acepta las obligaciones consignadas en la regla 8a., y si no las acepta, no le será admitida la proposición." [Énfasis suplido.] ▆

Guiados por el principio cardinal de que la ejecución de un crédito de rango inferior no debe perjudicar un crédito preferente, con un criterio flexible de interpretación de la legislación hipotecaria para que responda al desarrollo de nuestra economía dinámica, **propicie la contratación y le dé firmeza al crédito territorial, y cónsono con el respeto a lo convenido entre el deudor y los acreedores, considerando,** además, que en Puerto Rico no está vigente el artículo 1516 de la Ley de Enjuiciamiento Civil Española,[13] es de rigor sostener que cuando el acreedor ejecutante se adjudica el inmueble en la primera subasta por el precio de tasación, no es necesario que se haya fijado como tipo mínimo el importe de las responsabilidades preferentes aunque éstas excedan del justiprecio contractual, si el ejecutante, aunque sea un segundo acreedor, asume y responde de los gravámenes y cargas preferentes —primer párrafo del artículo 127 y tercer párrafo del artículo 128. Y en este supuesto no entran

---

[13] Guasp, *op. cit.*, pág. 145, manifiesta que "hubiera bastado con la derogación del artículo 1516 de la Ley de Enjuiciamiento para que se entendiera vigente el régimen de subsistencia de cargas." Ese artículo 1516 estaba consagrado en forma subyacente en nuestro procedimiento en el párrafo 6 del artículo 172 del Reglamento (*no vigente*) que establecía que "la subasta se verificará en la forma prevenida para el juicio ejecutivo."

en juego ni el párrafo cuarto del artículo 128 ni el tercero del artículo 172 del Reglamento.

La cirugía judicial que por vía de interpretación nos hemos constreñido a realizar para darle contenido a las disposiciones legales envueltas y firmeza a la práctica diaria en el trámite ejecutivo sumario pone de relieve una vez más la inaplazable e imperiosa necesidad de que se proceda, sin más demora, a la revisión de la legislación hipotecaria vigente. En tres distintas ocasiones en el corto lapso de dos años este Tribunal se ha referido a la incompatibilidad de preceptos que aún aparecen en la Ley Hipotecaria, y que no responden a un plan científico y debidamente sincronizado —*Autoridad de Tierras* v. *Registrador*, supra; *Vecchini, Etc.* v. *Registrador*, supra, y el presente recurso gubernativo. La tarea no es demasiado difícil si se aprovecha en cuanto vale la experiencia de España con sus reformas de 1909 y 1946 y el nuevo Reglamento de 1959. Parece apropiado señalar que ésta reforma debe estar orientada a resolver los numerosos problemas de índole registral con que se enfrenta nuestra creciente economía industrial y la creciente expansión urbana con sus variadísimos problemas de crédito y de financiamiento. Finalmente, y no menos importante, corresponde a quienes en primera instancia interpretan esta ley hacerlo en forma que facilite y no entorpezca las transacciones, con más atención a su sustancia que a los detalles teóricos, y teniendo en mente como principio que al Registro de la Propiedad se acude a buscar protección y no perjuicio.[14]

---

[14] Desde el año 1925 la Asamblea Legislativa evidenció su preocupación por la necesidad de reforma de la Ley Hipotecaria. En la Resolución Conjunta Núm. 24 de 2 de junio de dicho año (Leyes, pág. 1045) se aludió a los numerosos cambios sufridos por la legislación hipotecaria en España, "gran parte de dichos cuerpos legales ha caído en desuso y otra parte está en conflicto con la nueva legislación introducida con motivo del cambio de gobierno y el progreso y adelanto en nuestra contratación y el medio ambiente actual."

*Se revocará la resolución recurrida y se ordenará la inscripción solicitada.*

El Juez Asociado señor Ramírez Bages no intervino.

Un nuevo intento de reforma se realizó en 1948 cuando el insigne hipotecarista puertorriqueño don Luis Muñoz Morales preparó por encargo de la Oficina de Consultas Legislativas, un anteproyecto de Código Hipotecario de Puerto Rico, en el cual se refundían en un solo cuerpo las disposiciones de la Ley Hipotecaria y de su Reglamento y se suprimían todos los títulos, artículos y disposiciones que quedaron sin aplicación al verificarse el cambio de régimen. En marzo 8 de 1950, el Senador Cruz Ortiz Stella presentó el P. del S. 191 para crear y poner en vigor el anteproyecto mencionado.