CASTLE ENTERPRISES, INC., recurrente, *v.* EL REGISTRADOR DE LA PROPIEDAD DE SAN JUAN, recurrido.

*Número:* 1387  *Resuelto:* 19 de marzo ·de 1963

*Sifre & Ruiz Suria,* abogados del recurrente; el Registrador recurrido compareció por escrito.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Mediante escritura pública la recurrente sujetó al régimen de propiedad horizontal un edificio de oficinas que construyó en la Avenida Ponce de León, esquina Calle del Parque, San Juan, Puerto Rico, el cual se conoce como "Condominio San Martín". Presentada para su inscripción la escritura, el Registrador recurrido la inscribió en parte pero denegó su inscripción en cuanto a una parcela, descrita en la escritura, destinada a estacionamiento de vehículos de motor.

Adujo el Registrador las siguientes dos razones para sosner su denegatoria: (1) "por no considerarse [la parcela de estacionamiento] *como elemento común* del Régimen de Propiedad Horizontal constituido por esta escritura de acuerdo con el Artículo 11 de la Ley Núm. 104 de 25 de junio de 1958, según enmendada, y (2) *no formar una sola finca* con la otra descrita en este documento [el solar del edificio] *ni colindar entre sí, de acuerdo con la misma Ley* . . ." (Subrayado nuestro.)

El Condominio San Martín consta de un primer piso destinado a usos comerciales y siete pisos superiores destinados a oficinas. Hace esquina, como se dijo antes, con las calles Ponce de León y del Parque. La parcela en cuestión, que es el área de estacionamiento del Condominio, da frente a la Calle del Parque, está cercana al Condominio, como a unos 100 metros del edificio, pero no colinda con el solar en que éste está ubicado.

¿Son correctos los dos planteamientos del señor Registrador? Creemos que no. El primer planteamiento del Registrador que consiste en no considerar el área de estacionamiento como elemento común, dentro del significado que ese término tiene en el régimen de propiedad horizontal, es claramente erróneo. La Ley de Propiedad Horizontal, Ley Núm. 104 de 25 de junio de 1958, en su Art. 11, designa elementos comunes, entre otros, a los siguientes: el terreno en que se asienta el edificio, los cimientos, paredes maestras, galerías, vestíbulos, ascensores, incineradores, todos los artefactos o instalaciones existentes para beneficio común, y

"todo lo demás que fuere racionalmente de uso común del edificio o necesario para su existencia, conservación y seguridad." 31 L.P.R.A. sec. 1291i. En el artículo siguiente dicha ley dispone que "También serán considerados elementos comunes, pero con carácter limitado... aquellos que se destinen al servicio de cierto número de apartamientos con exclusión de los demás ..." 31 L.P.R.A. sec. 1291j.

No se necesita argumentar mucho para demostrar que un área de estacionamiento es una pertenencia muy conveniente y necesaria para los titulares de un condominio de 7 pisos de oficinas, ubicado en la Avenida Ponce de León de San Juan de Puerto Rico. Tomamos conocimiento judicial de lo densamente poblado del área, del denso tránsito de vehículos de motor que por las calles Ponce de León y del Parque transita y de la aguda escasez de facilidades de estacionamiento que hay en el sector en donde está situado el condominio San Martín.[1] Además puede añadirse que hay una determinación oficial de lo necesario que es el área de estacionamiento para ese edificio, pues la Junta de Planificación se la exigió a sus constructores. El propio Registrador expresa en su alegato que "resulta obvio que esta unidad de propiedad exclusiva no puede existir aisladamente como si estuviere suspendida en el espacio; necesita complementarse por otras partes o elementos del edificio que permitan al dueño de dicha unidad disfrutarla adecuadamente, tales como: ... sótanos, azoteas, patios y jardines ..." Si es *obvio* que esa propiedad necesita sótanos, azoteas, patios y jardines no debe ser difícil entender que también necesita un área de estacionamiento de vehículos, o que por lo menos, dicha área de estacionamiento es lo suficientemente útil y conveniente para que resulte "racionalmente de uso común del edificio" que es todo lo que la ley exige.

▮▮▮ De manera que un área de estacionamiento ciertamente es, como dice la ley, "racionalmente de uso común del

---

[1] *Castro* v. *Autoridad de Transporte*, 72 D.P.R. 465, 469 (1951); *De Castro* v. *Junta de Comisionados*, 59 D.P.R. 676, 685 (1942).

edificio," o sea del uso común de los condóminos o titulares, que es lo que quiere decir la ley. También resulta dicho elemento ser, en este caso, "necesario para su existencia" (la del edificio)—seguimos la letra de la ley otra vez—porque, como dijimos, fue un requisito exigídole a sus constructores por la Junta de Planificación. Aclaramos, sin embargo, que bajo el citado apartado (g) del Art. 11 de la Ley de la Propiedad Horizontal basta con que el elemento común sea "racionalmente de uso común del edificio" o que sea "necesario para su existencia, conservación y seguridad." Es suficiente que exista una de esas dos circunstancias para que la pertenencia sea un elemento común; no tienen que concurrir ambas. En el caso de autos, como se ha visto, concurren ambas circunstancias.

La escritura mediante la cual se sujetó el Condominio San Martín y sus dependencias al régimen de la propiedad horizontal dispone que el área de estacionamiento allí descrito será un elemento común de los siete pisos superiores, lo que excluye el primero. ("The parcel of land described below is a common element to the seven upper floors to be used for the parking of motor vehicles.") Esos siete pisos son los destinados a oficinas.

■ Concluimos, pues, que dicha área de estacionamiento es un elemento común limitado del Condominio San Martín, a tenor con las disposiciones expresas de la Ley de Propiedad Horizontal contenidas en sus Arts. 11 (g) y 12, 31 L.P.R.A. secs. 1291i (g) y 1291j. En vista de las dos citadas disposiciones de la ley es claro que la enumeración allí contenida no es taxativa sino ejemplificativa. Acordes con este criterio están Batlle, *La Reforma del Artículo 396 del Código Civil*", 171 Revista General de Legislación y Jurisprudencia, Madrid, 1942, págs. 243, 249; y Racciatti, *Propiedad por Pisos o por Departamento*, Buenos Aires, 1958, pág. 73. Este autor va más lejos y a la pág. 97 de la obra citada escribe:

"Además de las partes del edificio dividido en pisos o departamentos de beneficio común o indispensables para mantener su seguridad—algunas de las cuales, según hemos visto, la ley enumera ejemplificativamente—que necesariamente deben ser comunes, los propietarios pueden, ya que nada se opone a ello, crear otros elementos comunes que aunque no respondan estrictamente a estos fines, tengan por objeto lograr un uso y goce más cómodo o de mayor renta . . ."

"Ello es posible . . . porque . . . las palabras *uso común* que la ley emplea deben tomarse en su acepción más alta. Ellas no se refieren simplemente al uso de la cosa, en un sentido gramatical o literal estricto, sinó que comprenden dentro de su amplitud, a todos los elementos o servicios de cualquier clase que puedan beneficiar a la comunidad de propietarios."

Es de la misma opinión—que la enumeración de elementos comunes que contiene la Ley de la Propiedad Horizontal "claramente se ve que es exemplificativa"—el Magistrado Tomás Ogayar. Véase su *Nuevo Régimen Jurídico de la Propiedad Horizontal* en la Revista de Derecho Privado, Madrid, 1960, Tomo 44, págs. 589, 871. Igualmente, Rabella, *La Propiedad Horizontal*, Barcelona, 1960, pág. 51.

El otro motivo que tiene el Registrador para negarse a inscribir la parcela de estacionamiento es que dicha parcela no forma una sola finca con el solar del edificio ni colinda con éste. Dos objeciones tenemos que hacer a este segundo planteamiento del Registrador. La primera consiste en que en una sociedad libre, gobernada bajo el imperio de la ley, cuando un funcionario público le dice a un ciudadano "Usted no puede hacer tal cosa," ese funcionario tiene que estar preparado para demostrar que su poder para imponer prohibiciones a la conducta de las personas, se basa en alguna disposición legal específica, esto es, su poder tiene que emanar de la Constitución, de una ley, o de algún reglamento promulgado bajo autoridad de ley. El Registrador no nos ha señalado ninguna disposición de ley o reglamento que exija el requisito que él le está exigiendo al recurrente o que lo faculte (al Registrador) para así exigirlo. Tampoco la he-

mos encontrado nosotros. El propio señor Registrador en su alegato nos dice "Es cierto que dicho requisito no aparece consignado en modo expreso en la Ley de la Propiedad Horizontal . . ." Sin embargo, él cree que el requisito está implícito en dicha Ley. No podemos apoyarlo. Las personas pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente en sus negocios y obras, siempre que no sean contrarios a las leyes (término que aquí incluye los reglamentos hechos bajo autoridad de ley), a la moral, ni al orden público. 31 L.P.R.A. sec. 3372. Lo que se propone hacer el recurrente no es contrario a la ley, a la moral, ni al orden público. (²)

■ La otra objeción que tenemos al mencionado segundo planteamiento del Registrador se basa en que al interpretar y administrar la Ley de Propiedad Horizontal se interpreta y se administra una legislación nueva destinada a hacer posible la realización de fines sociales y económicos, necesarios en nuestros días. Por eso su interpretación y administración debe ser constructiva e imaginativa. Hoy se trata de un condominio de oficinas; mañana se puede tratar de un condominio de viviendas. Es oportuno recordar lo que Castán, con su habitual sabiduría, ha escrito sobre el particular:

"Resalta en todas las soluciones que el autor nos propone, el deseo de adaptar la institución de que se trata a las exigencias y fines prácticos que parece llamada a satisfacer en nuestros días. Tal orientación sólo alabanza merece, a juicio nuestro. *Por mucha que sea la importancia de la técnica en el derecho privado, no cabe sacrificar a sus conveniencias de sencillez los imperativos de la finalidad, que es nervio del Derecho.* Y puesto que la propiedad de casas por pisos se ha desenvuelto y generalizado en la vida real para resolver problemas sociales tan apremiantes como el de la habitación, y para satisfacer necesidades y anhelos tan vitales y humanos como el de tener casa

(²) Lo que hemos dicho en este párrafo no va dirigido al señor Registrador recurrido, quién, estamos seguros, actuó movido por la mejor intención y en la forma que él creyó era su deber actuar al interpretar las leyes concernidas. Para esa actitud sólo puede haber respeto, pero creemos conveniente aclarar la situación.

propia, justo es que construyamos la institución e interpretemos las normas que la rigen del modo que mejor se acomode a esas exigencias económicas y sociales que constituyen su razón de ser." (Subrayado nuestro.)—Prólogo del citado autor a *La Propiedad de Casas por Pisos*, de Batlle, 1ra. ed., Madrid, 1933, pág. 9.

Decimos que se trata de una legislación nueva pero estamos conscientes del pasado. Hay antecedentes remotos de esta institución de casas por pisos—Egipto, Grecia, Roma— y la misma era conocida en la Europa de los siglos 16, 17 y 18, aunque con carácter excepcional. Su generalización es moderna e hija de nuevas necesidades económicas. Cuando comienzan las corrientes codificadoras modernas, a fines del siglo 18 y durante el siglo 19, es el Código Napoleónico, padre de códigos civiles, el primero que recoge en su texto esta institución. El Art. 664 de dicho Código, que data del 1804, fue adoptado con o sin variantes por muchos códigos civiles. Así, lo adoptaron Quebec, Portugal, Italia, España, Ecuador, Panamá, Honduras, Mexico, China, Japón, Venezuela, Grecia, Filipinas, Cuba y Puerto Rico. En nuestro Código Civil, ed. 1930, corresponde al Art. 330, 31 L.P.R.A. sec. 1275, el cual procede del 396 español. Al margen se copia dicho Art. 330 de nuestro Código Civil tal como regía antes de ser enmendado por la Ley Núm. 421 de 13 de mayo de 1951.[3]

---

[3] "Art. 330.—Cuando los diferentes pisos de una casa pertenecen a distintos propietarios, si los títulos de propiedad no establecen los términos en que deban contribuir a las obras necesarias y no existe pacto sobre ello, se observarán las reglas siguientes:

1. Las paredes maestras y medianeras, el tejado y las demás cosas de uso común, estarán a cargo de todos los propietarios en proporción al valor de su piso.

2. Cada propietario costeará el suelo de su piso. El pavimento del portal, puerta de entrada, patio común y obras de policía comunes a todos, se costearán a prorrata por todos los propietarios.

3. La escalera que desde el portal conduce al piso primero se costeará a prorrata entre todos, excepto el dueño del piso bajo; la que desde el primer piso conduce al segundo piso se costeará por todos, excepto los dueños de los pisos bajo y principal, y así sucesivamente."

De la lectura del citado Art. 330 nuestro—muy parecido al de otros códigos civiles debido, como se ha dicho, a su común origen—se puede ver su insuficiencia para regir hoy día las varias manifestaciones que la técnica moderna ha hecho posible de esta institución de las casas por pisos o propiedad horizontal.

Luego de la primera Guerra Mundial se inició una fuerte corriente legislativa sobre la materia y se aprueban en muchos países europeos y americanos leyes especiales sobre la propiedad horizontal para satisfacer las necesidades que las breves e insuficientes disposiciones de los códigos civiles no podían satisfacer.(4) Para mayores detalles del trasfondo histórico de esta institución y para consideraciones de derecho comparado sobre la misma, puede verse Batlle, *La Propiedad de Casas por Pisos*, 3ra. ed., 1956, págs. 15–41; Gómez Gil, *La Propiedad Horizontal en Cuba*, 1954, págs. 27–38; Racciatti, *Propiedad por Pisos o por Departamentos*, 2da. ed., 1958, págs. 3–20; Bugeda, *La Propiedad Horizontal*, 1954, págs. 3–20; Ventura-Traveset, *Derecho de Propiedad Horizontal*, 1961, págs. 11–18; Batlle, 171 Revista General de Legislación y Jurisprudencia, pág. 243 (1942) ; Poirier, *La Propiedad Horizontal*, 2da. ed., 1955, págs. 1–25; Ogayar, 144 Revista de Derecho Privado 869 (1960) y Castán, *Derecho Civil Español, Común y Foral*, 9a. ed., 1957, Tomo II, págs. 329–343.

El Informe a la Cámara de Representantes de Puerto Rico de la Comisión de lo Jurídico de dicho cuerpo, rendido

---

(4) Aprueban leyes especiales sobre la propiedad horizontal Bélgica y Hungría en 1924, Rumanía en 1927, Brazil en 1928, Suecia en 1931 y 1942, Italia en 1934, 1935 y 1942, Polonia en 1934, Bulgaria en 1935, Chile en 1937, Francia en 1938, Uruguay y Perú en 1946, Argentina y Colombia en 1948, Bolivia en 1949, Alemania en 1951, Holanda en 1951 y 1952, Cuba en 1952, Méjico en 1954, Portugal en 1955, en España (en donde el Código Civil y la Ley Hipotecaria se enmendaron en 1939) se promulgó una ley especial en 1960, y en Puerto Rico, en donde el Código Civil y la Ley Hipotecaria se enmendaron en 1951 (utilizando las enmiendas españolas del 1939) se aprobó la vigente Ley de la Propiedad Horizontal en 25 de junio de 1958, Ley Núm. 104, 31 L.P.R.A. secs. 1291 a 1293k.

al informar sobre el proyecto de ley que más tarde se convirtió en nuestra Ley de la Propiedad Horizontal, dice en parte:

"Como consecuencia de lo antes expresado, ha surgido la institución de la propiedad horizontal, o sea, aquella en la cual los diferentes pisos o apartamientos de un edificio pertenecen a distintos dueños por separado y los elementos comunes del edificio pertenecen a todos, en comunidad. Esta nueva forma de la propiedad que, aunque conocida en el Derecho romano, por su poca frecuencia, no tuvo en él una regulación suficiente, necesita cauces jurídicos por los cuales desenvolverse para que no sea un nido de conflictos que amarguen la realización del ideal del hogar propio.

"Los códigos de tipo latino mencionan la institución, a la que refieren una parca y deficiente regulación. Posteriormente ha habido una abundante floración de leyes sobre el particular, motivadas por la importancia y difusión creciente de esta modalidad, que ya se va implantando en casi todo el orbe.

"En Puerto Rico, el Artículo 330 del Código Civil, edición de 1930, (31 L.P.R.A. 1275) según fue enmendado por la Ley Núm. 421 de 13 de mayo de 1951, regula la propiedad de casas por pisos. Esta disposición está complementada por una enmienda introducida al Artículo 8 de la Ley Hipotecaria (30 L.P.R.A. 33), por la Ley Núm. 422 de 13 de mayo de 1951, mediante la cual se permite la inscripción de los pisos como fincas independientes, en el Registro de la Propiedad.

"*Las disposiciones del Código Civil y de la Ley Hipotecaria, ya mencionadas, son omisas o insuficientes* en cuanto a diversos aspectos vitales de la propiedad horizontal, como por ejemplo, (a) nacimiento y extinción de la propiedad horizontal, (b) régimen de administración, (c) *organización en el Registro de la Propiedad,* (d) gravámenes, (e) y equilibrio de derechos y deberes entre los propietarios, y en general, no abarcan con el detalle necesario esta institución, que por su trascendencia justifica la mejor regulación.

"Por estas razones Vuestra Comisión recomienda la aprobación de este proyecto de ley sobre propiedad horizontal, siguiendo en líneas generales las disposiciones de la Ley—Decreto Núm. 407 de 16 de septiembre de 1952 de la República de Cuba, que es una de las más avanzadas que se conocen, y que cubre, en forma abarcadora, todo lo relativo a esta institución.

Hemos introducido, naturalmente, aquellas modificaciones que el estudio de la materia nos ha aconsejado, así como aquellos cambios necesarios para adaptarla a nuestra jurisdicción. La medida contempla la división de edificios en propiedad horizontal no sólo para viviendas sino también para cualesquiera otros tipos de usos o aprovechamientos."—*Diario de Sesiones* (Cámara), Vol. X, pág. 1574 (1958). (Subrayado nuestro.)

Sobre el particular escribe Batlle:

"Se trata de una figura nueva no considerada con la debida atención general hasta tiempos recientes, porque también dijimos que es reciente la necesidad económica a que responde. Su género es el derecho de propiedad, pero dentro de él es una especie destacada de los demás tradicionales y es vano buscarle a toda costa semejanzas o identidades parciales para que sea subsumida y absorbida en otros tipos clásicos. Su importancia enorme y su trascendencia social justifican más que sobradamente su consideración independiente." [5]

La Exposición de Motivos de la ley española de propiedad horizontal, la de 21 de julio de 1960, expresa "La presente Ley pretende, pues, seguir la realidad social de los hechos . . . Siendo ello así, el régimen de la propiedad horizontal no sólo precisa ser reconocido, sinó que además requiere que se le aliente y encauce, dotándole de una ordenación completa y eficaz... La Ley representa, *más que una reforma de la legalidad vigente, la ordenación ex novo, de manera completa, de la propiedad por pisos.*" (Subrayado nuestro.)

Regresando al problema de si procede o no la inscripción de la parcela en cuestión, a pesar de no colindar la misma con el solar principal, nótese que el legislador de hace casi 100 años al redactar la Ley Hipotecaria española y su Reglamento, que nosotros heredamos, producto que era de una civilización eminentemente agrícola, comprendió que se podían inscribir bajo un solo número varias fincas rústicas aunque no colindasen entre sí, si formaban "un cuerpo de bienes dependientes o unidos, con uno o más edificios y una o

---

[5] Obra citada, 3ra. ed., pág. 63. V. además Racciatti, obra citada, 2da. ed., pág. 30.

varias piezas de terreno . . . con tal que pertenezcan al mismo cuerpo de bienes y a una sola persona, o a varias pro indiviso . . ." Art. 61 del Reglamento Hipotecario, 30 L.P.R.A. sec. 919. *Baetjer* v. *Registrador*, 48 D.P.R. 647, 668 (1935).

■ Como explica Casso Romero, se trata de la finca *discontínua*, que "es la constituida por varias fincas normales . . . no contiguas entre sí *pero que se reúnen por un motivo de dependencia o conexión económica, para su explotación o aprovechamiento.*" ([6])   (Subrayado nuestro.)

Como explica Roca Sastre, "cuando se trata de fincas *discontínuas*, será necesario [para agruparlas] que exista entre las varias fincas agrupadas *aquella conexión económica o dependencia . . . cuya circunstancia suple la otra de colindancia.*" ([7])   (Subrayado nuestro.)

■ No existiendo prohibición específica en las leyes de Puerto Rico y tratándose de la interpretación de una ley especial, moderna, que ha sido necesario promulgar en casi todos los países de Derecho Civil, precisamente para curar las omisiones e insuficiencias de los antiguos códigos civiles y leyes hipotecarias, bien puede verse que ese mismo argumento—el de que las fincas rústicas que se reúnen por motivo de dependencia o conexión económica para su aprovechamiento son inscribibles bajo un solo número aunque no colinden entre sí—que era bueno hace un siglo (y que sigue siendo bueno) es también bueno para el caso de autos en que dos fincas urbanas no contiguas entre sí "se reúnen por un motivo de dependencia y conexión económica para su aprovechamiento."

Enfocando este problema en forma moderna, explica Roca Sastre que "Desde el punto de vista hipotecario pueden distinguirse dos grupos de fincas: unas *normales, comunes o corrientes* y otras *anormales, especiales o excepcionales.*"   La finca *normal* es el trozo de terreno de límites

---

([6]) *Derecho Hipotecario o del Registro de la Propiedad,* 4ta. ed., Madrid, 1951, pág. 241.

([7]) *Derecho Hipotecario,* 5ta. ed., 1954, Tomo II, pág. 114.

determinados que todos conocemos y las "fincas *especiales* son aquellas fincas de configuración especial o aquellas cosas, objetos o conjunto de elementos que, no reuniendo las circunstancias antes indicadas, reciben la consideración o trato hipotecario de las fincas normales, a los efectos de la apertura de la correspondiente hoja registral."[8] (Bastardillas nuestras.)

Como dice la resolución de 2 de enero de 1928, citada por Roca Sastre en el lugar antes indicado, "la palabra finca parece empleada en la ley Hipotecaria y su Reglamento unas veces con referencia a la superficie deslindada y encerrada en un solo perímetro, y otras como entidad hipotecaria compleja que comprende varias parcelas o diversidad de elementos económicos." El autor citado menciona las fincas *discontínuas* como un ejemplo de esas fincas especiales.[9]

Al inscribir la parcela de estacionamiento como un elemento común limitado del Condominio San Martín en nada se vulnera el objetivo de la publicidad que es el principal fin del Registro de la Propiedad y que va dirigido a proporcionar seguridad jurídica en el tráfico inmobiliario.[10]

No es obstáculo para la inscripción de la parcela de estacionamiento, como elemento común limitado del Condominio, el hecho de que la misma ya tenga su propio asiento en el Registro, pues como dispone la propia Ley, la propiedad horizontal se organiza en el Registro "por un sistema de fincas enlazadas entre sí por notas marginales de mutua referencia." 31 L.P.R.A. sec. 1292c. Como señala Batlle "Las soluciones simples no son las mejores y las realidades económicas y sociales no pueden subordinarse a las exigencias de una técnica abstracta."[11]

---

[8] Obra citada, Tomo II, pág. 63.
[9] Ibid.
[10] Roca Sastre, obra citada, Tomo I, pág. 18.
[11] Obra citada, 3ra. ed., pág. 167.

Ventura Traveset al comienzo de su capítulo sobre "El Régimen de la Propiedad Horizontal Ante el Registro de la Propiedad", obra citada, pág. 98, se expresa como sigue:

"Sin embargo, podemos constatar por una larga y meditada experiencia que si el Derecho no es una elucubración científica que informe la realidad, sino precisamente todo lo contrario, y prueba de ello son las primeras palabras del preámbulo de la nueva ley que afirma categóricamente que 'si toda ordenación jurídica no puede concebirse ni instaurarse a espaldas de las exigencias de la realidad social a que va destinada, tanto más ha de ser así cuando versa sobre una institución que, como la propiedad horizontal ha adquirido, sobre todo en los últimos años, tan pujante vitalidad . . .' si el Derecho es algo vivo, el Derecho hipotecario también es una realidad, y que todas, absolutamente todas las normas registrales son perfectamente compatibles con aquella realidad social y, por lo tanto, que el órgano puede ajustarse a la función y no la función al órgano."

▆▆▆▆ Señala el señor Registrador que las disposiciones de la Ley Hipotecaria se consideran complementarias a la de la Ley de la Propiedad Horizontal; eso es cierto, pero nótese que no se considerarán *limitativas* sino *complementarias*. Siendo la Ley de la Propiedad Horizontal una ley especial, promulgada expresamente para los fines antes indicados, y debido a la ya señalada insuficiencia de las disposiciones antiguas del Código Civil y de la Ley Hipotecaria, no puede considerarse que la Ley Hipotecaria le pone una camisa de fuerza a la Ley de la Propiedad Horizontal. Todo lo contrario; en todo lo que sea posible la Ley Hipotecaria facilitará la realización en la práctica de la Ley de la Propiedad Horizontal y de los fines de ésta. Como dijimos en *Arroyo* v. *Registrador*, 86 D.P.R. 362 (1962), "al Registro de la Propiedad se acude a buscar protección y no perjuicio."

No está de más recordar que, como ha escrito Castán, la verdad es que el análisis de los motivos y finalidades de la norma jurídica supone una delicada y compleja apreciación de intereses prácticos y de ideales éticos y culturales. Sobre todo exige ahondar en las realidades de la vida, en sus exi-

gencias económicas y sociales. Y en esta idea fundamental están conformes los representantes de las más opuestas escuelas. ([12])

*Por las razones expuestas en esta opinión se revocará la nota recurrida y se ordenará la inscripción por dicha nota denegada.*

---

([13]) *Teoría de la Aplicación e Investigación del Derecho,* 1947, pág. 241.