JUAN ARCE PRESTON y OTROS, demandantes y recurrentes, *v.* CARIBBEAN HOME CONSTRUCTION CORPORATION y OTROS, demandados y recurridos.

*Número:* R-74-274 *Resuelto:* 28 de diciembre de 1978

228

230

*Manuel A. Kortright* y *J. Valldejuly Rodríguez,* abogados de los recurrentes; *Carlos H. Todd,* abogado de Caribbean Home Construction Corporation y Caribbean Towers, Inc.; *Tilley & Esteves,* abogados de Building Management Corp.; la Asociación de Dueños del Condominio Caribbean Towers, Inc., no **compareció.**

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

Caribbean Towers, Inc., concibió y construyó—por conducto de Caribbean Home Construction Corp.—en un solar de su propiedad situado en la Ave. Ponce de León, Parada 11, Miramar, un edificio compuesto de un sótano, cuatro pisos para el arrendamiento de comercio y oficinas y áreas de estacionamiento y ocho pisos de apartamientos de vivienda para destinarlos al alquiler. Posteriormente cambió de planes, y mediante escritura número 320 otorgada el primero de diciembre de 1966 sujetó el terreno y edificio al Régimen de Propiedad Horizontal a tenor con las disposiciones de la Ley Núm. 104 de 25 de junio de 1958 (31 L.P.R.A. sec. 1291 *et seq.*). De un análisis cuidadoso de la escritura matriz surge que el edificio—denominado a perpetuidad *Condominio Caribbean Towers*—consta esencialmente de dos áreas: comerciales y vivienda. Identificadas siguiendo el método de descripción de la escritura, las áreas comerciales se componen de un sótano (nivel menos uno) ;[1] un piso terrero consistente de un área comercial (nivel cero) ;[2] un área de oficinas (nivel uno) ;[3] un segundo piso denominado área de estaciona-

---

[1] El sótano o nivel menos uno tiene una superficie de 5,461.68 metros cuadrados (m/c) ; de los cuales 5,073.39 son áreas de estacionamiento privadas propiedad de Caribbean Towers, Inc., y el remanente o 388.30 m/c son áreas comunes compuestas por un cuarto de "clorinación de alcantarillado ·sanitario", varios pozos de elevadores, dos vestíbulos de elevadores, escaleras, un cuarto de interruptores eléctricos, un cuarto para la incineración de desperdicios, un corredor, un closet de contadores de mantenimiento, un cuarto para el depósito de latones de basura, un closet para las terminales de la red telefónica y un pequeño pasillo.

[2] El piso comercial o nivel cero tiene una superficie de 5,955.35 m/c, de los cuales 5,665.33 constituyen áreas privadas propiedad de Caribbean Towers, Inc. y el remanente de 290.01 m/c son áreas comunes compuestas por pozos de elevadores, escaleras, pasillos, vestíbulos, buzones de correos y cuartos que albergan los circuitos del sistema eléctrico y telefónico y el sistema de eliminación de desperdicios.

[3] El piso de oficinas o nivel uno tiene una superficie de 5,572.32 m/c; 4,570.09 son áreas privadas propiedad de Caribbean Towers, Inc., oficinas y ascensor de carga y 890.21 m/c constituyen un área privada de estaciona-

miento con entrada y salida en la parte posterior del edificio con acceso a la Calle McKinley a través de una rampa (nivel dos) ;[4] y un área de oficinas en el nivel tres.[5] Las áreas residenciales consisten de las restantes ocho plantas, las primeras seis compuestas por 180 apartamentos y las últimas dos por 30 apartamentos de dos plantas cada uno (*duplex*).

Como resultado de esta escritura y la propiedad conservada en condominio por Caribbean Towers, Inc., ésta tiene un interés de cincuenta y tres por ciento (53%) en los elementos comunes, quedando el remanente distribuido entre los demás condóminos.

Los elementos comunes generales descritos son los siguientes:

1. las paredes maestras,
2. una planta eléctrica,
3. una cisterna de agua potable,
4. un tanque séptico,
5. los pasillos de entrada,

---

miento y circulación propiedad de dicha entidad Caribbean Towers, Inc. y 112.02 m/c son áreas comunes compuestas por el pozo de elevadores, pasillos, vestíbulos, escaleras y cuarto albergando el sistema eléctrico e incinerador. Hay en este piso, en adición a las áreas ya descritas, un área privada de 1,051.42 m/c propiedad de Caribbean Towers, Inc., en la que se encuentran una zona de estacionamiento y sistema de enfriamiento de aire acondicionado de los pisos niveles cero, uno y tres. Hay también un área común limitada de entretenimiento de 413.15 m/c, reservada para el uso exclusivo de los ocupantes de los condominios vivienda (piscina).

[4] El piso de estacionamiento, o nivel dos, tiene una superficie de 1,836.15 m/c. Son áreas privadas, 1,681.74 m/c; comunes, limitadas al uso de los condominios de vivienda, 456.10 m/c, y, comunes, 112.03 m/c cubierto de 983.21 m/c, un espacio para oficinas de 521.85 m/c y espacios para aires acondicionados de 34.89 m/c. Los elementos comunes limitados se componen de dos cuartos para conmutadores y dos para transformadores. Los comunes generales son un vestíbulo, el pozo de los ascensores, una escalera y dos cuartos, uno del sistema eléctrico y otro para la chimenea del incinerador y productos de limpieza. Existe en este nivel, un área de estacionamiento exterior propiedad de Caribbean Towers, Inc., de 3,772.83 m/c.

[5] El segundo piso de oficinas o nivel tres tiene una superficie de 1,836.15 m/c, de los cuales 1,790.20 constituyen áreas privadas de oficinas propiedad de Caribbean Towers, Inc. y 49.95 m/c son áreas comunes compuestas por pozo de elevadores y escaleras.

6. dos bombas para agua,
7. las redes de electricidad, teléfono y pluvial,
8. las escaleras,
9. las subestaciones eléctricas 1, 2, 3, 4 y 5,
10. dos incineradores,
11. demás equipo mecánico y aquellos que se detallan en las descripciones de los diferentes pisos y niveles y los que especifica la ley.

Y los elementos comunes limitados enumerados son:

A. las facilidades enumeradas a continuación serán elementos comunes pero limitados al uso de los pisos números 4 al once:
 1. los pasillos de cada piso, y
 2. la piscina.
B. los cuatro ascensores de pasajeros son elementos comunes pero limitados al uso de las oficinas, áreas comerciales y apartamientos localizados en los niveles cero hasta la planta número diez.

A la fecha de otorgamiento de la escritura de constitución del Régimen de Propiedad Horizontal se aprobó un Reglamento de Administración y Co-Propiedad del Condominio Caribbean Towers, que se incorporó a dicha escritura en unión al pliego de planos de construcción, conforme lo dispuesto por el Capítulo I del propio Reglamento y los Arts. 24 y 36 de la Ley de la Propiedad Horizontal (31 L.P.R.A. secs. 1292b y 1293).

La promoción de ventas tuvo buena acogida, y se vendieron los apartamentos. El 24 de julio de 1968, Caribbean Towers, Inc., entregó la administración del edificio a los condóminos quienes eligieron una directiva para la Asociación de Dueños del Condominio Caribbean Towers, Inc., corporación organizada e inscrita bajo las leyes del Estado Libre Asociado de Puerto Rico el 18 de julio de 1968 y cuyos accionistas son los condóminos propietarios del edificio. El derecho al voto de los accionistas se regula y "está basado en la proporción que el valor [que] cada propiedad individual guarda con el valor de todas las propiedades individuales", según lo establece la

escritura. (Págs. 106–134). Building Management Corporation, entidad que se dedica a administrar edificios y condominios, es la administradora del Condominio Caribbean Towers, en virtud de contrato otorgado con la Asociación de Dueños del Condominio Caribbean Towers, Inc.

Poco después de haberse hecho la entrega del edificio algunos condóminos comenzaron a apreciar las siguientes dificultades en la operación del edificio: cambio en el uso de dos ascensores acordado en una reunión de la asociación de condóminos y puestos a la disposición exclusiva de Caribbean Towers, Inc., reservándose los otros para el uso de los condóminos de las áreas residenciales; carencia de estacionamiento gratuito requiriéndoles Caribbean Towers, Inc., el pago de un canon mensual de $20.00 en concepto de arrendamiento por el uso de dichas facilidades; y notificaciones a las convocatorias de las reuniones de la Asociación de Dueños sin cumplirse estrictamente el método requerido en el Art. 8 del Reglamento. Advirtieron además que no existía un área de juegos ilustrada en el folleto de promoción de ventas y que aparece en el plano de construcción y permiso de uso aprobado por la Junta de Planificación de Puerto Rico.

Así agraviados y molestos, ocho condóminos—Juan Arce Preston, Angel Ruiz, Edgar J. Charneco, Frank Rodríguez, Augusto Pietri, Enrique Martínez, María T. Iturregui y Carmen Ana Heres—incoaron demanda contra la constructora del edificio Caribbean Home Construction Corp.; Caribbean Towers, Inc., como vendedora y entonces dueña de un 53% del Condominio; la administradora Building Management Corp.; Junta de Directores de la Asociación Dueños del Condominio Caribbean Towers, Inc. y tres miembros de dicha Junta, Ignacio Roca Bacó, Rose S. Kicks y Renée A. Geyl. El Tribunal Superior, dictó sentencia declarando la demanda sin lugar en todas sus partes. ([6])

---

([6]) Al terminar la prueba, con el allanamiento de su abogado, se desestimó por incomparecencia la acción en cuanto a los demandantes Angel

No conforme, los demandantes acudieron ante nos solicitando la revisión de dicho dictamen.

## I

Antes de examinar los señalamientos específicos de las partes es menester exponer algunos principios básicos sobre los perfiles jurídicos y fines del régimen de propiedad horizontal.

■ La Ley de Propiedad Horizontal vigente al otorgarse la escritura de autos es la Núm. 104 de 25 de junio de 1958 ([7]) (31 L.P.R.A. sec. 1291 *et seq.*). Su texto se basa en la Ley-Decreto Cubana Núm. 407 de 16 de septiembre de 1952. *Lozada Ocasio* v. *Registrador*, 99 D.P.R. 435, 440–441 (1970); *Diario de Sesiones de la Asamblea Legislativa de Puerto Rico*, vol. 10, tomo 4, 2004 (1958); Pérez Lobo, *Código Civil y Legislación Civil Complementaria*, 769–781 (2da. Ed. 1955); Aguirre, *Dos Conferencias sobre Propiedad Horizontal en torno a la ley de Puerto Rico*, 36 Revista Crítica de Derecho Inmobiliario 305 (1963); Casellas, *En Torno a la Nueva Ley de Propiedad Horizontal*, Nota, 28 Rev. Jur. U.P.R. 301–311 (1958–59).

■ Aun cuando diversos tratadistas debaten teóricamente su naturaleza jurídica, ([8]) la presente cita nos da una idea sencilla y correcta de la institución: "la propiedad horizontal es una propiedad exclusiva sobre diferentes pisos o

---

Ruiz, Carmen Ana Heres y Edgar H. Charneco. (T.E., I, pág. 106 y T.E., II, pág. 46.)

([7]) Enmendada sustancialmente mediante la Ley Núm. 157 de 4 de junio de 1976.

([8]) Para una discusión de las diversas teorías y los distintos países y tratadistas que han adoptado cada una, consúltese: Castán, *Derecho Civil Español, Común y Foral*, II, Vol. 1, 349–355 (1971); Aguirre, *op. cit.*, Ogayar, *Nuevo Régimen Jurídico de la Propiedad Horizontal*, 44 Revista de Derecho Privado, 859–863 (1960); Borja, *La Propiedad de Pisos o Departamentos en Derecho Mexicano*, 49–84 (1957); Batlle, *La Propiedad de Casas por Pisos*, 45–65 (3ra. Ed. 1956).

apartamentos, bajo un régimen necesario de aprovechamiento compuesto en los elementos comunes, los cuales, para viabilizarlo, permanecen en estado de indivisión forzosa." Bugeda Lanzas, *La Propiedad Horizontal*, 31 (1954). Y las siguientes expresiones compendian adecuadamente la doctrina imperante en nuestra jurisdicción:

"El nuevo Derecho contempla la horizontalidad como una institución jurídica de caracteres propios, en que la propiedad singular y exclusiva de los pisos o apartamientos concurre, en inseparable unidad, con el condominio sobre los elementos comunes al servicio de aquéllos. En esta concepción los elementos comunes tienen naturaleza accesoria y los pisos o apartamientos carácter principal. El condominio de los elementos comunes significa una comunidad de uso, goce, disfrute o aprovechamiento a beneficio de las cosas principales, que son los pisos o apartamientos. Y tal comunidad reglada actúa de manera que, sin perder su condición de anejo inseparable de las cosas principales, en estado de indivisión forzosa, el funcionamiento de ella comprende al edificio en su conjunto o unidad y se refleja en la vida cotidiana y en la existencia jurídica de las dichas cosas principales". Aguirre, *Tercera Conferencia sobre Propiedad Horizontal*, 36 Revista Crítica de Derecho Inmobiliario, 504, 520–521 (1963).

■ De las citas transcritas afloran sus características conceptuales esenciales: dominio exclusivo de un piso o apartamento que coexiste con un condominio forzoso e inseparable de los elementos comunes. Su propósito es ". . . permitir la agrupación de distintas viviendas bajo un mismo techo, o la existencia de un conglomerado de construcciones sometidas a un mismo reglamento, para cumplir con su función económico-social de facilitar a los individuos la posibilidad de disponer de hogar propio." Racciatti: *Propiedad Por Pisos o Por Departamentos*, 85 (3ra. Ed. 1975).

■ Este objetivo presupone: (a) la existencia de diversos pisos o apartamentos susceptibles de aprovechamiento independiente con acceso directo a la vía pública; (b) una serie

de áreas denominadas elementos comunes generales *necesarios* para la existencia, seguridad y conservación del edificio y destinados al uso y disfrute de todos los apartamentos; y (c) otros elementos comunes *limitados* que se distinguen de los generales en que se les destinan al servicio de cierto número de pisos.

■ Según el Art. 11 de la ley, los elementos comunes generales de todo inmueble sometido al régimen horizontal están integrados—con carácter de *numerus apertus*—por el "terreno en que se asienta el edificio [ ; l]os cimientos, paredes maestras, techos, galerías, vestíbulos, escaleras y vías de entrada y salida de comunicación [ ; l]os locales o instalaciones de servicios centrales, como electricidad, luz, gas, agua fría y caliente, refrigeración, cisternas, tanques y bombas de agua, y demás similares [ ; l]os ascensores, incineradores de residuos y, en general, todos los artefactos o instalaciones existentes para beneficio común [ ; y t]odo lo demás que fuere racionalmente de uso común del edificio o necesario para su existencia, conservación y seguridad." (31 L.P.R.A. sec. 1291i, incisos (a), (b), (e), (f) y (g). Además, este articulado consigna como elementos comunes generales, *salvo pacto en contrario*, los sótanos, azoteas, patios, jardínes y los locales destinados a alojamiento de porteros o encargados del edificio. La glosa identifica estos últimos como elementos *comunes generales voluntarios*. "La diferencia . . . estriba en que los elementos comunes generales necesarios, por su propia naturaleza, siempre han de ostentar dicho carácter. La voluntad de los titulares no puede otorgarle ni privarlos de tal condición, porque la misma viene impuesta por mandato de la Ley, en atención a su indispensable uso común. Frente a ellos, existen otros elementos comunes generales [voluntarios] que no se requieren ineludiblemente, y por lo tanto, al desaparecer el motivo que restringe la libre manifestación de los copropietarios, quedan sometidos a lo que dispongan éstos sobre su

reglamentación." Bugeda Lanzas, *op. cit.*, 37–38. Sobre este artículo el Doctor Aguirre señala que "se presume en todo caso la naturaleza de elemento común, y tal presunción, en las excepciones taxativas que la ley admite, solo cede ante la prueba de un convenio en contra, adoptado por todos los propietarios de los apartamientos. *O por haberlo establecido la persona (natural o jurídica) que constituyó dicha propiedad horizontal*". *op. cit.*, 342. (Bastardillas nuestras.)

 Con características de elementos comunes, pero *limitados* por voluntad expresa, el Art. 12 de nuestra ley reconoce "aquellos que se destinen al servicio de cierto número de apartamientos con exclusión de los demás, tales como pasillos, escaleras y ascensores especiales, servicios sanitarios comunes a los apartamentos de un mismo piso y otros análogos". (31 L.P.R.A. sec. 1291j.) "[E]n un edificio sometido al régimen de propiedad y condominio, pueden existir determinados bienes que no sean ni de propiedad exclusiva de un propietario, ni tampoco pertenezcan pro indiviso a la totalidad de éstos, sino que solamente sean comunes a un cierto grupo de propietarios. 'Se concibe, por ejemplo,'—dice Batlle Vázquez—, 'que exista una escalera general para el servicio de todos los pisos, pero también que haya escaleras que sirvan para el uso de un cierto sector de pisos, y lo mismo se puede decir de patios, corredores, etcétera', *casos semejantes serán el de un estacionamiento que solo tuviera cupo para los automóviles de los dueños de ciertos departamentos . . .*". Borja, *op. cit.*, 163. (Bastardillas nuestras.)

## II

Tomando como punto de partida esta breve exposición doctrinaria, evaluemos separadamente los señalamientos de error, aclarando que del examen de la prueba testifical y documental, no existe base para sustituir las apreciaciones fácticas de la sala sentenciadora. Esta, aquilató y dirimió ra-

cionalmente la credibilidad de los testigos, gestión sostenida por la evidencia en autos. (⁹)

A—*Controversia sobre las Áreas de Estacionamiento:*—

Hemos visto previamente, que como resultado de la escritura matriz se dispuso que del edificio—que consta de un sótano dedicado a estacionamiento privado, una primera planta a utilizarse para comercio y oficinas, y áreas de estacionamiento, una tercera planta dedicada a estacionamiento y oficinas, un cuarto piso de oficinas y seis plantas de apartamientos—Caribbean Towers, Inc., retuvo propiedad sobre ciertas áreas descritas como "privadas", teniendo sus dueños un "título particular y exclusivo sobre ellas". Entre estas áreas privadas se encuentran el sótano y las tres primeras plantas del edificio, que son dedicadas a comercio, oficinas y estacionamiento. Como propietaria de tales pisos paga una hipoteca que grava las mismas, satisface las contribuciones y los gastos de mantenimiento. Al expresarse que Caribbean Towers, Inc., sería la dueña de estos pisos se consignó que:

". . . tendrá el derecho de segregar en parcelas individuales del total, y vender, arrendar o disponer igualmente de los mismos en favor de terceras personas, y podrá ejercer todos los derechos concedidos y permitidos por las leyes a un titular individual en relación con las parcelas segregadas, disponiéndose que para todos los propósitos de votación y participación en los gastos del edificio los dueños de las nuevas parcelas segregadas tendrán los mismos derechos que su dueño individual actual, la Caribbean Towers, Inc., basado en el porcentaje proporcional de la parcela segregada tendrá en el valor total de dicha área privada propiedad de la Caribbean Towers, Inc. como antes queda aquí estipu-

---

(⁹) Ello dispone del error imputádole al tribunal de instancia al concluir que Caribbean Towers, Inc., no cometió fraude al usar como propaganda para vender los apartamientos un folleto preparado cuando planeaba alquilarlos y en el cual se ofrecía lugar de estacionamiento. La prueba refleja que si bien se utilizó dicho folleto en la venta de los apartamientos, no hubo fraude o engaño alguno pues se advirtió a los compradores que no tenían derecho a estacionamiento gratuito, sino mediante un canon mensual de $20.00.

lado. Cada una de las parcelas segregadas formarán un condominio separado para todos los propósitos legales y de registro, disponiéndose que de acuerdo con futuras posibles segregaciones los compradores tendrán el derecho de hacer las instalaciones de agua, conexiones de radio, teléfono y televisión y podrán usar los elevadores y otros elementos comunes generales *o elementos comunes limitados pertinentes a dicho piso según aquí se dispone* y que sean necesarios para el uso de las parcelas segregadas, *siempre que no estén en conflicto con los usos e intereses de los otros condueños"*. (Págs. 134–135.) (Bastardillas nuestras.)

Como consecuencia, los dueños de los apartamientos no disponen de lugar para estacionar *gratuitamente* sus vehículos de motor. Caribbean Towers, Inc., ha convertido las áreas de estacionamiento en unas de estacionamiento público—con licencia de DACO—cobrando por su uso, aunque ofrece a los condóminos residenciales un espacio por canon mensual montante a $20.00. La tesis de los recurrentes es que tal pacto es nulo.

■ Al analizar este señalamiento nos percatamos que el texto original de la Ley Núm. 104 nada disponía con relación a los lugares de estacionamiento. Es mediante enmienda posterior en el año 1976 que se regulan expresamente tales áreas, las cuales el legislador clasificó como un "elemento común general", aunque *voluntarios* al permitir y admitir pacto en contrario.([10]) Los comentaristas que discuten el problema son

---

([10]) Los Arts. 11(g) y 14 de la Ley Núm. 104, según enmendada por la Ley Núm. 157 de 4 de junio de 1976 disponen:

"Se consideren elementos comunes generales del inmueble:

........ (g) Toda área destinada a estacionamiento, *salvo disposición o estipulación en contrario"*.

. . . . . . . . .

"Cada titular podrá usar de los elementos comunes conforme a su destino, sin impedir o estorbar el legítimo derecho de los demás.

"Cuando el estacionamiento fuere elemento común, todo titular tendrá derecho a hacer uso de un espacio de estacionamiento con capacidad para acomodar un automóvil para cada apartamiento de que fuere propietario que estuviere ocupado. Ningún titular podrá hacer uso de un espacio de estacionamiento que exceda aquella cabida, si con ello priva a otro titular del disfrute efectivo de tal elemento común. Si el número de espacios de

parcos, pues muchos ni siquiera mencionan los lugares de estacionamiento y otros se limitan a unos someros comentarios. Estos últimos consideran los garajes elementos comunes sobre los cuales tienen derecho todos los titulares a no ser que en la escritura de constitución de régimen se le adjudiquen unos espacios determinados a cada titular para su uso, en cuya situación los mismos constituyen elementos privados *anejos* del apartamento. Fuentes Lojo, *La Cuota de Participación en las Fincas Divididas en Apartamientos*, en 4 Estudios de Derecho Civil en Honor del Prof. Castán Tobeñas, 447–448 (1969) ; Aguirre, *op. cit.*, 321; Borja, *op. cit.*, 163.

La Comisión de lo Jurídico de la Cámara, al recomendar la aprobación del proyecto que posteriormente se convirtió en la Ley Núm. 104, expresó *inter alia:* ([11])

"Uno de los problemas más graves y acuciantes de la vida moderna es el de la habitación. Una fuerte tendencia hacia la vida ciudadana impulsa a los hombres hacia la urbe, determinando grandes aglomeraciones que producen como resultado la carencia o escasez de habitaciones que, especialmente en estos tiempos, no pueden ser construídas con ritmo paralelo a la superpoblación, llegando a crear situaciones de verdadera angustia y malestar social.

De una manera espontánea ha brotado en la vida social un medio de los muchos imaginados para resolver tan ardua cuestión. Las casas en la ciudad son caras y el valor de los terrenos es enorme, por lo cual sólo pueden tenerlas las personas de nivel económico elevado. Por esto se ha pensado en adquirir, no ya una casa, sino un piso o apartamiento de la misma, o sea, aquello que se podría tener por el contrato de inquilinato, pero con la satisfacción de poseer un hogar propio para establecerse de una manera más permanente.

Como consecuencia de lo antes expresado, ha surgido la institución de la propiedad horizontal, o sea, aquella en la cual los

estacionamiento con capacidad para acomodar un automóvil fuere menor que el número de apartamientos, tales espacios serán ocupados por los titulares que primero arriben al área de estacionamiento".

([11]) *Diario de Sesiones de la Asamblea Legislativa de Puerto Rico,* Vol. 10, tomo 3, pág. 1574 (1958), citado en parte en *Castle Enterprises, Inc.* v. *Registrador,* 87 D.P.R. 775, 784–785 (1963).

diferentes pisos o apartamientos de un edificio pertenecen a distintos dueños por separado y los elementos comunes del edificio pertenecen a todos, en comunidad. Esta nueva forma de la propiedad que, aunque conocida en el Derecho romano, por su poca frecuencia, no tuvo en él una regulación suficiente, necesita cauces jurídicos por los cuales desenvolverse para que no sea un nido de conflictos que amarguen la realización del ideal del hogar propio."

■ Vemos por lo tanto que la Ley Núm. 104 fue aprobada con el propósito de establecer una regulación detallada y completa del régimen de Propiedad Horizontal con el objetivo de promover este tipo de construcciones a fin de que las familias que habitan en áreas urbanas densamente pobladas y donde el costo de la vivienda es el más elevado, puedan tener un hogar propio y a la vez haya un mejor aprovechamiento del escaso terreno disponible en esas áreas. *Asoc. de Condómines* v. *Naveira*, 106 D.P.R. 88 (1977) ; *Asoc. Condóminos* v. *Seguros Arana*, 106 D.P.R. 133 (1977). Aclaramos que la ley abarca edificaciones no sólo de viviendas sino también para cualesquiera otros usos lícitos. Para lograr fomentarlas fue necesario la aprobación de una legislación completa y abarcadora que evitase y corrigiese las ambigüedades, lagunas, arbitrariedades, fricciones entre condóminos y una serie de situaciones desagradables existentes en aquel entonces y cuyo efecto era disuadir a las personas de invertir en apartamientos de condominios. Aguirre, *op. cit.*, 313–321; Ogayar, *op. cit.*, 859–863; Batlle, *op. cit.*, 9–12; Batlle, *La Reforma del Artículo 396 del Código Civil por la Ley de 26 de octubre de 1939*, 171 Rev. Gen. Legis. y Juris. 242–245 (1942).

Si bien la Ley Núm. 104 fue un gran adelanto en la regulación de la Propiedad Horizontal y remedió muchos males, no logró cumplir satisfactoriamente sus propósitos de largo alcance.([12]) Así, con visión del futuro, en *Castle Enterprises*,

---

([12]) Véase la Exposición de Motivos de la Ley Núm. 157 de 4 de junio de 1976.

*Inc.* v. *Registrador*, 87 D.P.R. 775, 781, 788–789 (1963), este Tribunal dijo:

". . . al interpretar y administrar la Ley de Propiedad Horizontal se interpreta y se administra una legislación nueva destinada a hacer posible la realización de fines sociales y económicos, necesarios en nuestros días. Por eso su interpretación y administración debe ser constructiva e imaginativa. *Hoy se trata de un condominio de oficinas; mañana se puede tratar de un condominio de viviendas.* [Énfasis suplido.]

. . . . . . . .

No está de más recordar que, como ha escrito Castán, la verdad es que el análisis de los motivos y finalidades de la norma jurídica supone una delicada y compleja apreciación de intereses prácticos y de ideales éticos y culturales. Sobre todo exige ahondar en las realidades de la vida y en sus exigencias económicas y sociales. Y en esta idea fundamental están conformes los representantes de las más opuestas escuelas."

Es con esta perspectiva que hemos de evaluar este planteamiento. El entonces Negociado de Permisos de la Junta de Planificación exigió cierto número de espacios de estacionamiento para los apartamentos de vivienda y locales comerciales y de oficina como requisito previo para autorizar la construcción y el uso del edificio del condominio, a tenor con las disposiciones aplicables del Reglamento de Zonificación. La cantidad de espacios requeridos para unos y otros depende del tamaño—medida superficial—de los apartamentos y locales. (23 R.&R.P.R. sec. 9–173.) La disponibilidad de tales áreas de estacionamiento no es un simple accesorio opcional o comodidad que la propietaria Caribbean Towers, Inc., incluyó voluntariamente en el edificio y en la escritura de constitución de régimen de Propiedad Horizontal, sino un requisito que una agencia del gobierno le impuso para autorizar la construcción y el uso del Condominio Caribbean Towers. Y en *Castle Enterprises*, supra, afirmamos:

"No se necesita argumentar mucho para demostrar que un área de estacionamiento es una pertenencia muy conveniente y necesaria para los titulares de un condominio de 7 pisos de ofi-

cinas, ubicado en la Avenida Ponce de León de San Juan de Puerto Rico. Tomamos conocimiento judicial de lo densamente poblado del área, del denso tránsito de vehículos de motor que por las calles Ponce de León y del Parque transita y de la aguda escasez de facilidades de estacionamiento que hay en ·el sector en donde está situado el condominio San Martín. Además puede añadirse que hay una determinación oficial de lo necesario que es el área de estacionamiento para ese edificio, pues la Junta de Planificación se la exigió a sus constructores. El propio Registrador expresa en su alegato que 'resulta obvio que esta unidad de propiedad exclusiva no puede existir aisladamente como si estuviere suspendida en el espacio; necesita complementarse por otras partes o elementos del edificio que permitan al dueño de dicha unidad disfrutarla adecuadamente, tales como: . . . sótanos, azoteas, patios y jardines . . . .' Si es *obvio* que esa propiedad necesita sótanos, azoteas, patios y jardines no debe ser difícil entender que también necesita un área de estacionamiento de vehículos . . . .

. . . resulta dicho elemento ser, en este caso 'necesario para su existencia' (la del edificio) . . . porque, como dijimos, fue un requisito exigídole a sus constructores por la Junta de Planificación." (Págs. 778–779.)

El hecho de que en este caso se trate de un condominio, que además de oficinas contiene comercio y viviendas, no desvirtúa el anterior razonamiento; por el contrario, le da más fuerza. Al contemplar las realidades de la vida diaria, sobre todo en zonas urbanas densamente pobladas como lo es aquella donde está sito Caribbean Towers, hay que concluir que los espacios de estacionamiento constituyen una facilidad necesaria que viabiliza el disfrute adecuado de los apartamientos de vivienda y los locales comerciales y de oficinas. En *Pellón* v. *O'Clare*, 98 D.P.R. 692, 699 (1970), reconocimos que un garaje puede ser privado igual que lo puede ser un apartamiento, y concluímos que "La naturaleza privada o común de un local de estacionamiento en estos casos depende esencialmente de lo que se pacte en las escrituras." En consecuencia, podemos afirmar que nuestro derecho vigente admite que los lugares de estacionamiento en un condominio

pueden ser elementos comunes generales (necesarios o voluntarios), elementos comunes limitados o elementos privados.

■ Este Tribunal ha expresado:

"El título constitutivo o escritura pública de una propiedad por pisos o apartamientos individuales dispuesto en los Arts. 22 y ss. de la Ley de la Propiedad Horizontal (104 de 25 de junio de 1958—31 L.P.R.A. sec. 1291 y ss.) es un estatuto privado que gobierna a los condóminos o titulares, y que una vez inscrito en el Registro de la Propiedad también obliga a tercero. A dicha escritura matriz, salvado el principio del Art. 1207 del Código Civil (31 L.P.R.A. sec. 3372) relativo a las leyes, la moral y el orden público, hemos de acudir para dirimir el conflicto en este caso pues todos y cada uno de los titulares al comprar sus respectivos apartamientos llevaron a efecto un claro acto de adhesión a lo allí estipulado. El título constitutivo de la propiedad en condominio recoge acuerdos y pactos que 'tienen un origen plurilateral cuando son establecidos en principio y por convenio por todos los interesados, o pueden tener origen unilateral cuando son establecidos por el propietario único del inmueble antes de dividirlo por pisos, formando un estado de derecho que se acepta sucesivamente por los adquirentes conforme van realizando sus adquisiciones, en cuyo caso nos hallamos más bien ante un contrato de adhesión.' Battle Vázquez, *La Propiedad de Casas por Pisos,* pág. 65, 3ra. ed., (1956).' (Notas al calce omitidas.) *Consejo de Titulares* v. *Vargas,* 101 D.P.R. 579, 582–583 (1973)*.*

Los hechos de este caso caen bajo la segunda situación que describe Battle: los acuerdos y pactos establecidos por la entonces propietaria única del inmueble y recogidos en el título constitutivo forman un estado de derecho a ser aceptado por los sucesivos titulares a medida que éstos adquirieran su condominio. Las cláusulas en controversia son válidas y obligan a todos los titulares del Condominio Caribbean Towers a no ser que violen alguna de las disposiciones del Art. 1207 relativas a las leyes, la moral o el orden público.

■ Ni la Ley de Propiedad Horizontal—en su texto original o enmendado—ni los Reglamentos de la Junta de Planificación requieren que se provea estacionamiento *gratuito* a

los titulares de un condominio. Tampoco la escritura de Propiedad Horizontal ni el Reglamento del Condominio en el caso de autos les concede tal derecho. En las enmiendas de la Ley en el año 1976 se caracteriza como un elemento común general *voluntario*, esto es, susceptible de ser pactado como correspondiente a un condómine en particular o a varios. Los demandantes-recurrentes no nos han citado—y nosotros no hemos podido encontrar—estatuto o reglamentación alguna en apoyo de su planteamiento. Nuestra simpatía natural hacia tal posición, no es óbice para que resolvamos que no tienen derecho a que se les provea gratuitamente tales lugares.

■ Advertimos, sin embargo, que el Reglamento de Zonificación (23 R.&R.P.R. sec. 9–1 *et seq.*), requiere cierto número de lugares de estacionamiento disponibles para los apartamientos de vivienda y otro número para los locales comerciales y de oficina. De surgir la eventualidad que *de facto* se les privara a los condóminos del uso de estos espacios de estacionamiento aun cuando estén dispuestos a pagar, se estarían violando las disposiciones del citado Reglamento y los condóminos afectados tendrían disponibles los remedios que provee nuestro derecho.

B—*Controversia sobre el Terreno:*—

Intimamente relacionado, los demandantes-recurrentes sostienen que las actuaciones de Caribbean Towers, Inc., en torno a las áreas de estacionamiento, constituyen un acto de privación dominical del terreno en que se asienta el edificio y por lo tanto una violación al precepto de la Ley Núm. 104 que dispone que dicho terreno es elemento común general. Argumentan que tal acto de privación dominical tiene el efecto de una división de este elemento común general.

■ No tienen razón. Primeramente, si bien la escritura de constitución de Régimen de Propiedad Horizontal establece que el terreno donde se asienta el edificio es elemento común general, es menester tener en mente que una cosa es el título

de dominio y otra el uso o aprovechamiento que en determinado momento se da al terreno. La primera planta de un edificio necesariamente queda directamente encima de una porción de terreno, pero ello no significa que esa porción le pertenezca individualmente a los apartamientos o locales de esa primera planta o que se esté privando a los demás titulares del derecho de dominio sobre dicha porción. Sabemos que por imperativo de ley, el terreno a que se asienta un edificio sujeto al régimen de propiedad horizontal es un elemento común general y por ende propiedad común de todos los dueños de unidades privadas existentes. No obstante, tal y como señala Racciatti, es importante aclarar si el terreno comprende exclusivamente el área sobre la cual se alza el edificio propiamente dicho, o si por el contrario se extiende a toda la superficie del suelo dentro de la cual se encuentra asentada la construcción sometida al sistema. El citado comentarista opta por la segunda alternativa pues entiende que la palabra "terreno" elegida por la ley argentina—y la nuestra—encierra dentro de su significado "el concepto de espacio o fracción de tierra ubicado entre ciertos límites perimetrales, con abstracción de la existencia de construcciones en él." *op. cit.*, 101. En el caso de autos vimos cómo en la escritura de constitución del régimen se dispuso que el solar del condominio, con toda su cabida, sería un elemento común general del inmueble.

Toda vez que dentro del régimen de propiedad horizontal han de combinarse necesariamente dos formas jurídicas distintas—el dominio y el condominio—surge como consecuencia lógica el que la propiedad sobre el suelo—que se extiende a toda su profundidad y al espacio aéreo sobre él—tenga las limitaciones de la existencia de propiedades individuales por encima de éste. Es preciso evitar la confusión ideológica del concepto suelo, que siempre es bien común, con el de piso o pavimento de cada unidad privada, que en todos los casos, por disposición contractual, pueden declararse de dominio exclusivo de sus respectivos dueños. Cada propietario

tiene sobre las cosas comunes un derecho de propiedad efectivo y completo, pero que sólo podrán materializarse o individualizarse cuando el condominio forzoso cese y se liquide por la destrucción física del inmueble. En resumen, en el régimen de propiedad horizontal cada condómino tiene el dominio absoluto de su unidad o apartamento y de una parte ideal indivisa del terreno donde se asienta la construcción.

■ Como conclusión, el hecho de que Caribbean Towers, Inc., se haya reservado el área de estacionamiento y de circulación para su uso privado no impide que los demandantes recurrentes adquiriesen, a tenor con las disposiciones estatutarias pertinentes, un derecho de propiedad sobre todo el terreno en que el estacionamiento está ubicado. La coexistencia de ambos derechos constituye la esencia del régimen de propiedad horizontal.

C—*Controversia sobre los Elevadores y Convocatorias a Reuniones:*—

■ Este planteamiento se suscita en virtud de un acuerdo adoptado en una reunión general del Consejo de Titulares celebrada en el año 1968 cambiando el uso de dos elevadores, reservándose dos exclusivamente para los pisos propiedad de Caribbean Towers, Inc. Dicho acuerdo—endosado por *una mayoría* de los condóminos—constituyó una decisión cambiando el carácter de dos ascensores de elemento común general a elemento común limitado. Los recurrentes cuestionan su validez a la luz de lo dispuesto en la Ley de Propiedad Horizontal y en el Reglamento de Administración y Co-propiedad del condominio Caribbean Towers (Reglamento). Tienen razón.

Al comentar previamente las disposiciones contenidas en el Art. 11 de la ley apuntamos, entre los elementos comunes generales de un inmueble, los ascensores existentes para beneficio común. (31 L.P.R.A. sec. 1291i(f).) El Art. 36 del Reglamento dispone que el edificio tendrá cuatro elevadores

de pasajeros, los cuales operarán desde el *ground floor* hasta el piso décimo del edificio, destinados al servicio general. Siendo ello así, ¿cómo podía variarse lo dispuesto en los artículos que preceden? La contestación la provee el Art. 12, también antes citado, que requiere el consentimiento expreso de "la totalidad de los titulares del edificio." (31 L.P.R.A. sec. 1291j.). El propio Art. 53 del Reglamento exige que para modificar lo dispuesto en el Reglamento se requerirá el voto conforme de todos los condóminos.

■ Toda vez que el adquirente de un apartamiento sometido al régimen de propiedad horizontal adquiere también un derecho de copropiedad sobre todos los elementos comunes, i.e. ascensores, es indispensable su consentimiento para disponer de éstos. No podían los demandados, bajo pretexto de asegurar el funcionamiento más eficaz de un elemento común variar el destino de éste, convirtiéndolo para todo fin práctico en un elemento común limitado de Caribbean Towers, Inc., suprimiéndole así el carácter común general.

Cabe mencionar que esta variación en el uso de ascensores fue transitorio pues posteriormente fue dejada sin efecto ante el reclamo de los condóminos.

Pertinente y relacionado con esta actuación, los demandantes alegan ciertas irregularidades en el procedimiento de convocatorias para las reuniones de condómines. El Art. 8 del Reglamento dispone que éstas se harán por medio de carta certificada dirigida a cada propietario. La sala sentenciadora acepta que en *ocasiones*—debido a dificultades económicas motivadas por la morosidad en el pago de las cuotas de mantenimiento—se optaba por prescindir de tal método de citaciones y las mismas se ponían por debajo de las puertas de los apartamientos individuales, y se colocaban avisos en sitios públicos y visibles del edificio. Concluyó que las convocatorias a las reuniones anuales cumplían sustancialmente con el requisito de notificación prescrito por el Reglamento del condominio, y por tanto fueron válidas.

Esta conclusión es contraria a la letra y espíritu del Art. 37 de la Ley, estableciendo que el "Reglamento proveerá, *obligatoriamente* [un . . .] sistema de convocatoria o citación para las reuniones . . . ." (31 L.P.R.A. sec. 1293a (b).) Este requisito no puede desconocerse por estimarse sancionado en miras del interés general. El Reglamento es una gestión legalmente indispensable para lograr la creación formal del régimen e imprescindible para hacer posible el regular el ejercicio y desenvolvimiento de los derechos derivados de la combinación de la propiedad común con los diversos dominios individuales. "En lo referente a su naturaleza jurídica, es necesario considerar el Reglamento como una verdadera Carta Magna de la Horizontalidad, ya que debe propender a la solución pacífica y justa de todos los conflictos que puedan presentarse, siguiendo los objetivos altamente sociales que inspiran la institución." Gómez Gil, *La Propiedad Horizontal en Cuba* (Editorial Lex, Habana, Cuba 1954) pag. 112. Aun cuando la elección de un sistema de convocatoria particular es prerrogativa de cada condominio, una vez éste es establecido en el Reglamento, su compulsoriedad es incuestionable.([13]) En el caso de autos, el método seleccionado no podía desatenderse; si las dificultades económicas no permitían que se cumpliera en todo momento con el requisito de notificación por correo certificado, debió realizarse un esfuerzo y en la primera oportunidad modificarse el Reglamento con el concurso unánime de todos los condóminos.

Reconocida la ilicitud de los actos de los demandados respecto al uso temporal indebido de ascensores y la informalidad en la convocatoria de reuniones, no hemos podido superar el escollo de que los demandantes fallaron en instancia en

---

([13]) El Art. 3 del Reglamento expresa:

"Todos los propietarios o arrendatarios de los diversos locales de que se compone el Edificio vienen obligados a acatar y cumplir plenamente todos los preceptos del presente Reglamento, cuya fuerza compulsoria también obligará a los que en el futuro entren a formar parte del Régimen, por cualquier título o medio reconocido en Derecho".

demostrar, mediante la preponderancia de prueba suficiente y competente, daños de naturaleza compensable por ambas actuaciones.

D—*Ilicitud de la Entidad Denominada "Asociación de Dueños del Condominio Caribbean Towers, Inc.":*—

Los recurrentes impugnan la decisión del foro de instancia resolviendo que la Asociación de Dueños del Condominio Caribbean Towers, Inc., sustituye válidamente al Consejo de Titulares establecido por la Ley Núm. 104 de 25 de junio de 1958.

Sobre el particular la sala sentenciadora formuló el siguiente pronunciamiento:

"La co-demandada Asociación de Dueños del Condominio Caribbean Towers [*sic*] es una corporación debidamente organizada bajo las leyes del Estado Libre Asociado de Puerto Rico, cuyos accionistas son los condómines propietarios del edificio Caribbean Towers y tienen derecho al voto de acuerdo con su proporción de propiedad en cada caso.

. . . . . . . .

El 24 de julio de 1968, la Caribbean Towers, Inc., en reunión celebrada, entregó la administración del edificio a los condómines, quienes eligieron una directiva para la Asociación de Dueños del Condominio Caribbean Towers [*sic*]. Esta corporación ha continuado desde entonces actuando a través de su Junta de Directores la cual se elige periódicamente en reuniones anuales.

. . . . . . . .

La Asociación de Dueños del Condominio Caribbean Towers, Inc. es una corporación válidamente constituida que rige los destinos del condominio a través de su Junta de Directores."

En oposición a la tesis de los recurrentes, los demandados recurridos sostienen que lo "que sucede es que en este caso el Consejo de Titulares y la Asociación de Dueños son una y la misma cosa . . . . Nada hay en la referida Ley 104 que obligue al Consejo de Titulares a denominarse de ese modo y en este caso específico, . . . no se denomina así, sino que se denomina Asocia-

ción de Dueños. . . . Adicionalmente, esta Asociación de Dueños funciona como y es una corporación donde cada condómino tiene un voto proporcional a su participación en el total de la propiedad."

■ Se cometió el error. Para viabilizar el gobierno conjunto de un edificio sometido a la propiedad horizontal, la ley crea como organismo rector y deliberativo el Consejo de Titulares. Le impone unas obligaciones, deberes y atribuciones, y específicamente en su Art. 21 manifiesta: ". . . siempre que en este Capítulo se haga referencia al Consejo de Titulares se entenderá la totalidad de ellos, pero integrarán quórum para la adopción de acuerdos la mayoría, según ha quedado definida ésta en el párrafo anterior, salvo los casos en que en este Capítulo se disponga otra cosa." (31 L.P.R.A. sec. 1291s.)

Consejo de Titulares significa, por tanto, la totalidad de ellos. Está compuesto por todos los dueños de apartamentos y locales(14) —"pisos" como se les llama en algunas legislaciones extranjeras cuando el apartamento ocupa un nivel completo— y es su función la de ejercer, en relación con el condominio, todos los actos que corresponden a un propietario; ello con sujeción a las disposiciones de la Ley de Propiedad Horizontal y del Reglamento del Condominio. Reconociendo su importancia, Puig Brutau lo caracteriza como el "órgano soberano en la organización y gobierno de la propiedad horizontal." III, Vol. II, *Fundamentos de Derecho Civil*, 462 (2da. Ed., 1973). Su naturaleza jurídica ha sido muy discutida. "A manera de sumario podemos decir que tres opiniones debaten [su] naturaleza jurídica . . ., a saber: la que considera que es un sujeto de derecho con personalidad propia, la que le niega personalidad y la que dice que tiene una personalidad propia pero limitada." Palmiero, *Tratado de la Propiedad Horizontal*, 191–

---

(14) El Reglamento del Condominio recoge esta definición en su Art. 6, que lee: "El Consejo de Titulares estará constituido por todos los propietarios o titulares de los locales individuales que integran el edificio."

192 (1974). Compartimos la tesis de aquellos estudiosos que consideran el Consejo de Titulares como "un auténtico sujeto de derecho con personalidad plena en el ámbito de sus finalidades." *Ibid.* Gómez Gil la describe como "una organización legal *sui-generis*, con carácteres propios, de diversos co-propietarios." *Op. cit.*, 103. Racciatti coincide con este criterio y razona que las facultades y deberes del Consejo de Titulares —denominado Consorcio de Propietarios en la Ley Argentina—"demuestra[n] la existencia de una finalidad distinta de la individual y, esencialmente, una clara titularidad patrimonial que contribuye a otorgar al *ente existencia jurídica independiente* a la de los miembros que lo componen cuando actúa en función del fin común perseguido." *Op. cit.*, 173 (Bastardillas nuestras.)

Aclarado este extremo, veamos las disposiciones pertinentes estipuladas en el Reglamento:

"CAPITULO III

Organos de Gobierno

Art. 4.—Los Organos de Gobierno y Dirección tendrán las obligaciones y atribuciones que le señala el presente Reglamento, así como las que les asigne el Consejo de Titulares.

CAPITULO IV

Del Consejo de Titulares

Art. 5—El Consejo de Titulares es la instancia suprema del sistema de Condominio, en el cual reside la plena y omnímoda soberanía del Régimen.

Sus resoluciones y acuerdos, tomados con el quórum y demás formalidades legales, son de ineludible e inexcusable cumplimiento por parte de todos y cada uno de los propietarios y demás personas que se relacionen con el mismo."

Es de notar que no existe en la Ley Núm. 104 precepto alguno que autorice a los titulares de un condominio a incorporarse para llevar a cabo las encomiendas que legal-

mente le corresponden al Consejo de Titulares. Tampoco está expresamente prohibido. Ante el silencio legislativo, nos inclinamos a sostener que la propia naturaleza de las funciones del Consejo de Titulares—relativas al dominio sobre el inmueble sujeto a Propiedad Horizontal—no permiten que los titulares se incorporen por las siguientes razones: (a) tal corporación no podría ejercer actos de dominio sobre el inmueble por no ser la dueña de los apartamentos y locales; (b) el diseño que inspira este estatuto reconoce la dinámica que entraña la convivencia social comunitaria y se erige sobre las bases de un poder ejercitado directamente por las personas afectadas que componen, como copropietarias, el condominio; y (c) tal entidad absorbería las facultades y deberes que la Ley de Propiedad Horizontal impone al Consejo de Titulares como ente separado y autónomo, y en tal extremo, contraviene el régimen legislado.

▆▆ A tono con lo preceptuado en la Ley General de Corporaciones se ordena su disolución, debiendo el Secretario del Tribunal notificar este decreto al Departamento de Estado cuando se remita el mandato. (14 L.P.R.A. sec. 2012.)

E.—*Controversia sobre Área de Juego:*—([15])

---

([15]) Hemos de omitir discutir el señalamiento relativo a la validez del contrato de administración suscrito entre la Asociación de Dueños del Condominio Caribbean Towers, Inc., con la codemandada Building Management Corporation. En virtud de nuestro pronunciamiento, ordenando la disolución de la primera, dicho contrato habrá de terminar, salvo que el Consejo de Titulares lo ratifique.

Tampoco nos detendremos en el apuntamiento atribuyéndole al tribunal de instancia haber resuelto erróneamente que la servidumbre de paso constituida a favor del edificio del Condominio Caribbean Towers no es elemento al cual tienen derecho de uso o de propiedad, los condóminos del Condominio Caribbean Towers, todo ello contrario a la escritura de constitución de servidumbre en favor de dicho Condominio. Basta exponer que si bien dicho foro mencionó esta servidumbre en sus Determinaciones de Hechos, no dispuso nada en cuanto a ella en sus Conclusiones de Derecho. De la certificación hecha por el Registrador surge que aparece inscrita una servidumbre de paso a favor del solar donde está sito el Condominio Caribbean Towers; en consecuencia, sus titulares tienen derecho a la misma. No surge de la prueba que se les haya privado de dicho uso, lo que ocurre es que Caribbean

Bajo este acápite los demandantes recurrentes alegan que los demandados recurridos no cumplieron con una oferta hecha a los adquirentes de apartamientos residenciales en el Condominio de proveerles, en la tercera planta (nivel 2), un área de juego en el piso de estacionamiento. Esta área aparece ilustrada y requerida en los planos aprobados por la Junta de Planificación que fueron unidos a la escritura matriz, y además, está mencionada en el folleto de propaganda utilizado en la promoción de ventas, especificada en el permiso de uso para el edificio y reiterada en una comunicación oficial que la Junta de Planificación enviara a los demandantes. Estos se quejan de que Caribbean Towers, Inc., construyó y habilitó en parte de este espacio unas oficinas de diseño y decoración de aproximadamente 25 pies por 45 de tamaño. Sobre el particular la prueba revela su existencia y los siguientes extremos: en su construcción no se utilizó material de hormigón permanente; la misma no constituyó una alteración que afectara la seguridad o solidez estructural del edificio; su construcción no fue autorizada inicialmente por la Junta de Planificación, sino que fue después de realizada que dicho organismo la aceptó y "legalizó". Frente a este reclamo, los demandados recurridos rechazan esta contención y exigencia a base de que en la escritura matriz de constitución de régimen no se incluyó disposición alguna al respecto.

El Art. 24 de la Ley de Propiedad Horizontal reza:

"La copia certificada de la escritura que origine la primera inscripción del edificio total y la copia certificada de la que origine la primera inscripción del apartamiento individualizado, para su inscripción en el registro de la propiedad, *deberán tener agregadas copias completas y fieles de los planos del edificio o de los planos del apartamiento de que se trate según los casos, para que queden archivados en el registro de la propiedad.* Dichos pla-

---

Towers, Inc., ha colocado una barrera de movilidad vertical para regular el tránsito vehicular de entrada y salida a sus áreas privadas de estacionamiento. Nada impide ni obstruye, el paso peatonal por las aceras colindantes del área en cuestión.

nos, serán certificados, sin pago de derechos, por el Secretario de la Junta de Planificación de Puerto Rico e indicarán de modo gráfico los particulares del edificio o del apartamiento, según los casos." (31 L.P.R.A. sec. 1292b.) (Bastardillas nuestras.)

Su texto corresponde a una enmienda introducida en virtud de la Ley Núm. 77 de 25 de junio de 1959. Su historial legislativo no nos ayuda pues se circunscribe al trámite parlamentario sin discusión. No obstante, las referencias consultadas nos permiten tener una idea al respecto.

A tal efecto, comentando esta disposición, el Doctor Aguirre acertadamente nos dice que "[l]a Ley, pues ha establecido un verdadero sistema catastral para los edificios en propiedad horizontal." *Op. cit.*, 335. En aquellos países en que existe el sistema de catastro, éste comprende "toda operación cuya finalidad y resultado sea la determinación de los valores y extensión de los fundos". I *Diccionario de Derecho Privado*, 828 (1954). Su formación requiere operaciones técnicas y su importancia radica en "su carácter complementario del Registro de la Propiedad, ya que por constituir el catastro una descripción gráfica de los fundos o edificaciones pertenecientes a cada propietario, completa y perfila definitivamente la finalidad del Registro de la Propiedad, *garantizando la existencia real de las fincas y de sus límites,* que en el Registro de la Propiedad sólo constan en un simple asiento. En tal sentido, el catastro cumple el importantísimo papel de proporcionar un título real de propiedad, *gráfico* y *descriptivo,* complemento eficacísimo y necesario de la mera titulación literal que el Registro de la Propiedad ofrece." *Ibid.* (Bastardillas nuestras.)

Bugeda Lanzas, refiriéndose a los planos en casos de condominios señala que ellos cumplen la tarea registral de "auxiliar a describir mejor el inmueble". *Op. cit.,* 88.

Al reflexionar sobre los propósitos de este requisito en nuestra ley—unir al proceso de protocolización de la escritura pública dichos planos—advertimos que el Legislador ha par-

tido de la premisa de que habrá correspondencia entre la relación expuesta en la escritura descriptiva del edificio y los planos que gráficamente ilustran tal descripción. Palmiero, comentando en su obra la ley argentina—concordante a la nuestra en cuanto al requisito legal del plano, aunque con ciertas variantes en otros extremos—describe la situación que allí imperaba antes de que se requiriera:

". . . era normal que el propietario vendiera una unidad ignorando el comprador lo que ocurría con las demás. Esta circunstancia hizo que al terminarse el edificio encontrara un sinnúmero de restricciones a su comodidad o confort que eran perfectamente legales en la medida en que las había consentido. Así se encontraba con que el propietario había hecho dos pisos más o dos pisos menos de los previstos, o que no existía tendedero, o que su superficie propia y común había variado sustancialmente por las modificaciones de obra que el propietario se reservaba invariablemente el derecho de hacer. La agregación del plano significará una saludable restricción a los derechos discrecionales del propietario vendedor en el sentido expuesto." Palmiero, *op. cit.*, 122.

Y concluye, que la ley persigue de este modo ". . . garantizar al comprador que no se alterara su porcentual, la línea de construcción ni las superficies del edificio. . . . Si al final la autoridad administrativa . . . no estuviera de acuerdo con el proyecto del constructor, se crearía un conflicto, y se va a crear, pero no hay dudas que en este caso habrá que estarse al proyecto, con la consiguiente responsabilidad del profesional interviniente, *si no sería muy fácil burlar la ley, y estaría desvirtuada la intención tuitiva de la norma*". Palmiero, *op. cit.*, 123. (Bastardillas nuestras).

A base de los términos y preceptos de la ley, es razonable que resolvamos que estos planos permiten que un comprador o titular conozcan la totalidad del edificio y su apartamento para fines de hacer valer sus derechos. Por lo tanto, la escritura matriz no puede ser la única fuente de obligaciones y derechos entre las partes. Los planos adheridos consagran

gráficamente los derechos de los interesados extendiéndose, como corolario, el ámbito de la fe pública registral a las características materiales del inmueble según éstas han sido representadas en dichos planos.

 Aplicado el derecho reseñado al caso de autos, toda vez que las condiciones que aparecen en los planos fueron requeridas por la Junta de Planificación para la aprobación del proyecto, (¹⁶) los demandantes recurrentes tenían perfecto derecho en exigirle a los demandados recurridos responsabilidad por la construcción y materialización del área de juegos. Estos últimos estaban impedidos de variar el uso proyectado sin haberlo aclarado a los compradores al firmarse las escrituras de compraventa, o sin el consentimiento ulterior unánime de los condóminos. Debieron haber apercibido a los adquirentes, si ese era su deseo, que el área de juego contemplada en los planos, permiso de uso y folleto de promoción de ventas no estaba comprendida. Aun cuando la Junta de Planificación "legalizara" *a posteriori* la edificación realizada, tal determinación podría solamente interpretarse como una autorización comprendiendo los aspectos materiales y físicos de la obra, bajo la premisa incorrecta de que sus promoventes tenían derecho a realizarla, y no como una derogación de los derechos y restricciones pactados por las partes.

 A tenor con lo expuesto, procede se ordene la demolición de la estructura erigida en el área de juego, y que las codemandadas Caribbean Home Construction Corp. y Caribbean Towers, Inc., acondicionen, en coordinación con el Consejo de Titulares, el área en cuestión para fines de recreo.

---

(¹⁶) Hemos examinado detenidamente estos planos (*Exhibit* 12) y en su quinta hoja—descriptiva del nivel 2 del edificio—aparece en la parte superior izquierda, bajo el número 12: "Children's Playground". En efecto, tal área de juego consta dibujada y marcada en tres secciones del centro de ese piso cubierto por el techo del nivel tres.

Está dividida en tres partes por razón de la ubicación de dos estructuras centrales que albergan ascensores, escaleras, cuarto del conserje, cuarto para instalaciones eléctricas y otras facilidades.

*Se dictará Sentencia expidiendo el auto solicitado y modificando la del Tribunal Superior, Sala de San Juan, a los fines de ordenar la disolución de la corporación denominada Asociación de Dueños del Condominio Caribbean Towers, Inc.; la demolición de la estructura levantada sobre el área de juego en la tercera planta (nivel 2) por Caribbean Towers, Inc. y su habilitación por Caribbean Home Construction Corp. Será confirmada en sus restantes extremos.*

El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Díaz Cruz concurren en el resultado sin opinión. El Juez Asociado Señor Martín no intervino.